**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARGO YATES-WILLIAMS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2554 |
| | § | |
| IBRAHIM EL NIHUM, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This memorandum opinion addresses the following motions:

1. College Station Medical Center (CSMC) moved to exclude the opinions of the plaintiffs' testifying experts, Dr. William Francis, Dr. Neil Kochenour, and Dr. Allan Hamilton. (Docket Entries No. 91, 98). CSMC supplemented its motions, (Docket Entries No. 99–102); the plaintiffs responded, (Docket Entries No. 94, 116); CSMC replied, (Docket Entry No. 118).

2. CSMC moved for summary judgment on the plaintiffs' claim that its negligence caused Margo Yates-Williams's injuries. (Docket Entry No. 109). The plaintiffs responded, (Docket Entry No. 117), and CSMC replied, (Docket Entry No. 119).

3. CSMC moved for summary judgment on the plaintiffs' causes of action based on the actions or omissions of its infection-control committee, including the gross negligence claims, (Docket Entry No. 129). The plaintiffs responded, (Docket Entry No. 140), and CSMC replied, (Docket Entry No. 161).

This court heard argument on the motions. Based on the motions, responses, and replies; the summary judgment record; the arguments of counsel; and the applicable law, the following orders are entered:

1. CSMC's motions to exclude the opinions of Dr. Francis, Dr. Kochenour, and Dr. Hamilton, (Docket Entries No. 91, 98, 99–102), are granted;

2. CSMC's motion for summary judgment on the plaintiffs' claim that its negligence caused Yates-Williams's injuries, (Docket Entry No. 109), is granted;

3. CSMC's motion to exclude the plaintiffs' "diabetes theory," (Docket Entry No. 126),

is denied as moot; and

4.      CSMC's motion for summary judgment on the plaintiffs' claims related to the infection-control committee, (Docket Entry No. 129), is granted.

The reasons for these rulings are explained below.

## I.      Background

On July 25, 2008, Dr. Ibrahim El Nihum performed a hemilaminectomy, a discectomy, and foraminotomy in the L5-S1 vertebral disk space of Margo Yates-Williams at CSMC.  Before her surgery, Yates-Williams worked at CSMC as a nurse.  After her surgery, Yates-Williams developed an infection in her L5-S1 disc space and surrounding spinal cord tissues (the cauda equina), from methicillin-resistant staphylococcie epidermis ("MRSE").  Yates-Williams alleges that the MRSE infection eventually caused cauda equnina syndrome, resulting in paralysis and weakness in her legs, foot drop, loss of bodily sensation, and dysfunction of her bladder and bowels.

Yates-Williams's infection was not treated surgically until August 31, 2008.[1]  Yates-Williams was discharged from CSMC after her initial surgery on July 26, 2008.  On August 4, 2008, Yates-Williams returned to the CSMC emergency room because of fevers and back pain.  The emergency-room doctor referred her to Dr. El Nihum.  Dr. El Nihum told Yates-Williams that her fever was unrelated to her surgery and told her to see her family doctor if her symptoms persisted.  On August 6, Yates-Williams saw a family physician, Dr. Lacrecia Foster, at the College Station Family Medical Center.  Dr. Foster observed a "fever of unknown origin," "lumbosacral pain," and sciatica on Yates-Williams's right side.  (Docket Entry No. 115-17, CSFMC Medical Records, 7).  Dr. Foster ordered an MRI of Yates-Williams's lumbar spine at CSMC.  After seeing the MRI

---

[1]  The record shows that this surgery appeared to proceed well.

results, Dr. Foster told Yates-Williams to return to her neurosurgeon for evaluation of a possible infection.  On August 7, 2008, Yates-Williams again saw Dr. El Nihum.  Dr. El Nihum looked at the MRI and told Yates-Williams that she did not have an infection.  On August 14, 2008, Dr. El Nihum again met with Yates-Williams and again told her that she did not have an infection.  (Docket Entry No. 59, ¶ 36).  On August 20, 2008, Yates-Williams returned to Dr. Foster, who told her to see a neurosurgeon.  Yates-Williams stated that she did not wish to return to Dr. El Nihum.  Dr. Foster referred her to Dr. Jonathan Friedman at Texas Brain & Spine.  Dr. Friedman ordered additional diagnostic testing, prescribed medication, and prescribed physical therapy; but he did not admit Yates-Williams to the hospital for monitoring.

On August 31, 2008, Yates-Williams arrived at CSMC on a stretcher.  Dr. Lon Young initially received her and noted that she had cauda equina syndrome and that he suspected a post-operative infection.  (Docket Entry No. 59, ¶ 41).  The same day, Dr. L. Gerard Toussaint performed surgery on Yates-Williams and "evacuated the infected tissues and commenced treatment for the infection."  (*Id.*, ¶ 43).  The plaintiffs allege that despite Dr. Toussaint's efforts, Yates-Williams "has continued to suffer from the cauda equina syndrome, including bowel and bladder incontinence, a markedly antalgic gait, positive straight leg on both legs, diminished reflexes at the knees, absent reflexes at the ankles, L5 muscle group weakness on the left, foot drop on the left, numbness on the right thigh distribution, weakness in all myotomes of her legs, and absent reflexes in her legs."  (*Id.*, ¶ 44).  Yates-Williams is now in a wheelchair and cannot walk on her own.

The plaintiffs, Yates-Williams and her three children, sued Dr. El Nihum, CSMC, Dr. Lacrecia Foster, College Station Family Medical Center, Dr. Jonathan Friedman, and Texas Brain & Spine.  (Docket Entry No. 1).  The plaintiffs have settled with Dr. El Nihum and he has been

dismissed from the lawsuit.  (Docket Entry No. 107).

The plaintiffs did not initially sue CSMC.  (Docket Entry No. 1).  In their First Amended Complaint, the plaintiffs added CSMC, alleging that it failed to provide sterile surgical instruments and solutions during Yates-Williams's surgery.  (Docket Entry No. 17, ¶ 47).  The allegations against CSMC did not change in the plaintiffs' Second Amended Complaint.  (Docket Entry No. 27).

During discovery, CSMC produced its Infection Control Annual Evaluations for 2007 and 2008.  CSMC's infection-control committee prepared the evaluations.  The 2007 Evaluation showed that CMSC's rate of surgical-site infections per 100 procedures for spinal fusions and laminectomies was 3.11 percent in 2007.  The 2008 Evaluation showed the rate for 2008 as 5.26 percent.  (Docket Entry No. 140-6, Infection Control Annual Evaluation for 2008).  The 2008 Evaluation showed that the national average for surgical-site infections per one-hundred procedures for fusions and laminectomies was 1.76.  (*Id.*).  It also showed that the infection-control committee had been conducting "targeted surveillance" on laminectomies and fusions since early 2007.  (*Id.*).

Dr. Ricardo Lemos, the head of CSMC's infection-control committee, stated in his affidavit that the infection-control committee, through peer review, tracks "various infections, including [surgical-site infection] rates."  (Docket Entry No. 129, Ex. A, Dr. Lemos Aff., ¶ 7).  The infection-control committee also determines "whether [a surgical-site infection] rate should be disclosed to anyone outside of the [infection-control committee], including medical staff," and, that it determines the manner of disclosure.  (*Id.*, ¶¶ 7, 9).  Dr. Lemos stated that "corrective action to reduce [a surgical-site infection]," including decisions on infection-control measures such as shutting down an operating room, are the infection-control committee's responsibility.  (*Id.*, ¶¶ 8, 10).  The

4

plaintiffs have not identified evidence contradicting these statements.  Nor is there evidence that, at the time of Yates-Williams's surgery, any CSMC staff physician or employee outside the infection-control committee had knowledge of CSMC's year-to-date 2008 surgical-site infection rates.

After discovering the 2008 Evaluation and with leave from the court, the plaintiffs filed their third amended complaint.  (Docket Entries No. 80, 83).  The plaintiffs alleged that CSMC was negligence in failing to:

1.   provide an operating room for laminectomy and discectomy procedures that was reasonably safe;

2.   provide surgical instruments for use in performing a laminectomy and discectomy that were not contaminated with bacteria;

3.   provide surgical materials for use in performing a laminectomy and discectomy that were not contaminated with bacteria;

4.   provide intravenous lines for performing a laminectomy and discectomy that were not contaminated with bacteria;

5.   inform Yates-Williams before her surgery of CSMC's 2007 and 2008 surgical-site infection rate for laminectomies and discectomies;

6.   inform members of CSMC's medical staff before Yates-Williams's surgery of CSMC's 2007 and 2008 surgical-site infection rate for laminectomies and discectomies;

7.   close CSMC's neurosurgical operating room until CSMC determined and remedied the reason for the increasing rate of surgical-site infections for laminectomies and discectomies;

8.   carry out the requirements of CSMC's infection-control plan; and

9.   take corrective action to reduce the surgical-site infection rate for laminectomies and fusions.

(Docket Entry No. 83, ¶ 17).

CSMC has moved for summary judgment on the plaintiffs' causes of action set out in paragraphs 5 to 9. CSMC argues that the bases for these claims are all acts by CSMC's infection-control committee and that under the Texas Medical Practices Act, TEX. OCC. CODE § 160.010 *et seq.*, medical peer-review committees are liable only for acts committed with malice. CSMC emphasizes that Yates-Williams has produced no evidence that any CSMC employee outside of the infection-control committee engaged in any of the acts forming the basis for Yates-Williams's claims. Yates-Williams responds that CSMC's failure to respond properly in mid-July 2008 to its year-end surgical-site infection rate shows that it was consciously indifferent to Yates-Williams.

CSMC has also moved for summary judgment on the remaining liability theories. CSMC argues that the plaintiffs have failed to produce reliable, necessary expert testimony that CSMC's failure to provide a reasonably safe operating room or failure to provide uncontaminated surgical materials caused Yates-Williams's injuries. The plaintiffs responded that they have produced reliable expert testimony on causation.

## II.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party

moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    The Claims Against CSMC for the Acts or Omissions of Its Infection-Control Committee:  Liability Claims 5 to 9

The Texas Medical Practices Act ("TMPA") limits liability based on a medical peer-review committee's acts or omissions. *See generally Benson v. St. Joseph Reg'l Health Ctr.*, Civ. A. No. H-04-4323, 2007 WL 7120757, at *6 (S.D. Tex. Mar. 22, 2007). A medical peer-review committee (or "professional review body") is:

> [A] committee of a health-care entity, the governing board of a

7

> health-care entity, or the medical staff of a health-care entity,
> provided the committee or medical staff operates pursuant to written
> bylaws that have been approved by the policy-making body or the
> governing board of the health-care entity and authorized to evaluate
> the quality of medical and health-care services or the competence of
> physicians to evaluate the quality of medical and health-care services
> and the competence of physicians . . . .

TEX. OCC. CODE § 151.002(8). "Medical peer review" means "the evaluation of medical and health

care services." TEX. OCC. CODE § 151.002(8).

The TMPA provides that:

> A cause of action does not accrue against a member, agent, or
> employee of a medical peer review committee or against a health care
> entity from any act, statement, determination or recommendation
> made, or act reported, without malice, in the course of medical peer
> review.

TEX. OCC. CODE § 160.010(b). The Texas Supreme Court has held that § 160.010(b) "prescribe[s]

a threshold standard of malice." *St. Luke's Hosp. v. Agbor*, 952 S.W.2d 503, 509 (Tex. 1997); *see

also Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 15 (Tex. 2005) (upholding appellate

court's determination that "there was no clear and convincing evidence of malice"). "'Malice'

means a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX.

CIV. PRAC. & REM. CODE § 41.001(7).[2]

---

[2]   The TMPA does not define "malice." The Texas Supreme Court has applied the Texas Civil Practice
& Remedies Code definition of "malice." *Romero*, 166 S.W.3d at 215; *St. Luke's*, 952 S.W.2d at 506.
Before 2003, the Code definition of "malice" was "a specific intent by the defendant to cause substantial
bodily injury or harm to the claimant" *or* "an act or omission: (I) which when viewed objectively from
the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the
probability and magnitude of the potential harm to others; and (ii) of which the actor has actual,
subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the
rights, safety, or welfare of others." *Romero*, 166 S.W.3d at 215; *St. Luke's*, 952 S.W.2d at 506. In 2003,
the Texas legislature limited "malice" to "a specific intent by the defendant to cause substantial bodily
injury or harm to the claimant." *See Romero*, 166 S.W.3d at 215 n.2. Though the *Romero* court applied
the previous malice definition because that definition applied at the time of the claims involved in the
case, it explicitly noted that the recent malice definition would make claims under the TMPA more

The only evidence identified by either party as relevant to whether the infection-control committee was a medical peer-review committee engaged in medical peer review supports CSMC's contention that the TMPA provisions apply.  Dr. Lemos, the head of CSMC's infection-control committee, stated in his affidavit that the infection-control committee is authorized by CSMC bylaws and "evaluates infections and infection-control-related medical and health-care-services quality via the medical committee and/or medical peer review committee process."  (Docket Entry No. 129, Ex. A, Dr. Lemos Aff., ¶ 4); Ex. C, Medical Staff Bylaws (describing the infection-control committee)).  *See also In re Univ. of Tex. Health Ctr. at Tyler*, 33 S.W.3d 822, 824 (Tex. 2000) (per curiam) (finding that documents created by the hospital's infection-control committee are privileged under TMPA provisions establishing privileges for documents created by medical peer review committees).  The plaintiffs have not disputed Dr. Lemos's claims or identified contravening summary-judgment evidence.  The acts or omissions the plaintiffs allege form the basis of their claims were acts or omissions by a medical peer-review committee conducting medical peer review.  *See Ching v. Methodist Children's Hosp.*, 134 S.W.3d 235, 242 (Tex. App.—Amarillo 2003, pet. denied) ("Hospitals can 'act only through agents of some character.'" (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)).  Under the TMPA, the plaintiffs must show "malice."

The plaintiffs assert the following acts or omissions as the basis of their claims:

1.      failure to inform Yates-Williams before her surgery of CSMC's 2007 and 2008 surgical-site infection rate for laminectomies and discectomies;

2.      failure to inform members of CSMC's medical staff before Yates-Williams's surgery

---

difficult for plaintiffs.  *Id.* at 225.  Texas appellate courts have applied the most recent definition of "malice" to the TMPA.  *See, e.g.*, *Kinnard v. United Reg'l Health Care Sys.*, 194 S.W.3d 54, 58 (Tex. App.—Ft. Worth 2006, no pet. h.).

of the 2007 and 2008 surgical-site infection rate for laminectomies and discectomies;

3.      failure to close CSMC's neurosurgical operating room until CSMC determined and remedied the reason for the increasing rate of surgical-site infections for laminectomies and discectomies;

4.      failure to carry out the requirements of CSMC's infection-control plan; and

5.      failure to take corrective action to reduce the surgical-site infection rate for laminectomies and fusions.

The evidence the plaintiffs identify in the summary judgment record as creating fact issues on these

claims is as follows:

•      CSMC had been conducting targeted surveillance on laminectomies and fusions since 2007 "and had determined that in 2007, the surgical site infection rate for neurosurgical procedures that were performed in [CSMC's] neurosurgical services was 3.11 per 100 procedures performed . . . approximately two times higher than the national 50th percentile rate . . . ." (Docket Entry No. 140, at 3).

•      "There was a document that stated . . . that in 2008, the surgical site infection rate for laminectomies and fusions that were performed in [CSMC's] neurosurgical service was 5.26 such surgical site infections per 100 procedures." (*Id.*).

•      "[CSMC] also had within its Infection Control Manual a Risk Prioritization 2008, which stated that surgical site infections, including fusions and laminectomies were 'high risk' and 'problem prone' and that trends and rates were sent to the department of surgery and that the IC Practitioner Surveillance was occurring." (*Id.*, at 3–4).

•      Quarterly reports of surgical-site-infection rates were not made to CSMC's medical staff. (*Id.*, at 4).

•      "[CSMC] never informed its medical staff or its nursing staff of the troubling issues with the high postsurgical risk in the neurosurgical department of [CSMC]." (*Id.*).

•      "[CSMC] was making huge sums of money from neurosurgical procedures performed there," and CSMC would lose money if staff and patients were aware of the high infection rates. (*Id.*).

•      Two of Yates-Williams's treating physicians, Dr. El Nihum and Dr. Slayton, were not informed of CSMC's infection rate and would have taken additional precautions if they knew the rates. (*Id.*, at 4–5).

- A CSMC nurse, Brandi Knight, who was CSMC's designated infection-control committee representative, testified that CSMC did not communicate the surgical-site-infection rate to its staff and that she was familiar with industry standards and publications showing that CSMC's surgical-site-infection rate was higher than national averages and above recommended levels.  (Docket Entry No. 117, at 9).

- Dr. Lemos testified it was "technically feasible for CSMC to have communicated to its emergency department that it was doing targeted surveillance on patients who had undergone neurosurgical procedure and that if one of those patients came back to CSMC's emergency department with signs and symptoms of a surgical-site infection to notify the Infection Control Coordinator."  (*Id.*, at 12).

- Dr. Kochenour, one of the plaintiffs' expert witnesses, testified that CSMC's infection-control practices violated standards of care by appointing Knight, who he argues was unqualified, to serve as the infection-control coordinator; by failing to abide by industry standards related to infectious-disease control; and by failing to inform the staff of the surgical-site infection rates.  (*Id.*, at 17).

- Two former supervisory nurses at CSMC provided affidavits stating that CSMC should have informed its staff of the surgical-site infection rates; that CSMC's data collection efforts were deficient; and that its breaches of standards of care caused Yates-Williams's injuries.  (*Id.*, at 18).[3]

Neither the allegations nor the evidence supports an inference that CSMC acted with malice, that is, with the intent to cause substantial bodily harm to Yates-Williams.  *See Kinnard v. United Reg'l Health Care Sys.*, 194 S.W.3d 54, 58 (Tex. App.— Ft. Worth 2006, no pet. h.) (finding that wrongful credentialing allegations that hospital credentialing committee, a medical peer-review committee, "did not conduct an adequate investigation and had ulterior motives for denying his privileges" does not create a fact issue as to malice); *see also Van v. Anderson*, 199 F. Supp. 2d 550, 576 (N.D. Tex. 2002) ("Negligence, lack of investigation, or failure to act as a reasonably prudent

---

[3]  The record shows that the year-end 2008 infection rates were not published until the end of 2008, after Yates-Williams's surgery.  (Docket Entry No. 129, Ex. D).  CSMC also asserts that it investigated the number of 2008 deep wound surgical-site infections and found during their investigation that three infections were improperly classified as fusion or laminectomy surgical-site infections for 2008.  It asserted that with these infections excluded, the surgical-site infection rate for fusions and laminectomies was 3.8%.  (Docket Entry No. 129, at 3 n.8).

person are insufficient to show actual malice."). CSMC's motion for summary judgment on liability theories 5 to 9 is granted.

## III.   The Claims Against CSMC for Causing the Infection:  Liability Theories 1 to 4[4]

### A.   Negligence

The plaintiffs' allegations that CSMC's failure to provide uncontaminated surgical materials and a reasonably safe operating room are allegations relating to medical treatment and are treated as malpractice claims.  "When the negligence alleged is in the nature of medical malpractice, the plaintiff has the burden of proving (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury, and (4) a causal connection between the breach of care and the injury." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003).  "It has long been the law in Texas that a plaintiff in a medical negligence case must 'prove by a preponderance of the evidence that the allegedly negligent act or omission was a proximate cause of the harm alleged.'" *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005) (citing *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949); *Kramer v. Lewisville Mem'l*

---

[4]   In response to CSMC's motions for summary judgment, the plaintiffs argued that CSMC is liable because it failed to diagnose Yates-Williams with MRSE after her surgery.  This theory of liability is not alleged in the plaintiffs' third amended complaint, (Docket Entry No. 59).  The plaintiffs have not sought leave to amend their complaint.  Even assuming that the plaintiffs requested such leave, this court would deny the plaintiffs leave to amend their complaint further.  A plaintiff should be denied leave to amend a complaint if the court determines that the proposed change would be futile.  6 CHARLES A. WRIGHT & ARTHUR R. MILLER FEDERAL PRACTICE AND PROCEDURE § 1487 (3d ed. 2004); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) (per curiam).  "In Texas, medical decisions are to be made by attending physicians." *Reed v. Granbury Hosp.*, 117 S.W.3d 404, 415 (Tex. App.—Ft. Worth 2003, no pet.). A hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions. *Id.*  (citing *Spinks v. Brown*, 103 S.W.3d 452, 456 n.4 (Tex. App.—San Antonio 2002, pet. denied)); *see also* TEX. OCC.CODE ANN. § 151.002(a)(13) (Vernon 2003) (defining "practicing medicine" as the diagnosis, treatment, or offer to treat a physical disease, disorder, or injury by a licensed physician or surgeon).  In addition, the claim would be barred by limitations.

*Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex. App.—Amarillo 2003)).  "For the alleged negligence to be a proximate cause of the harm, the harm must have been a foreseeable result of the negligence, and the negligence must have been 'a substantial factor in bringing about the harm, and without which the harm would not have occurred.'"  *Id.* (citing *Kramer*, 858 S.W.2d at 400; *Park Place*, 909 S.W.2d at 511; *Archer*, 118 S.W.3d at 782).

"Lay testimony may be used as evidence of causation in certain circumstances, but when expert testimony is required, lay evidence supporting liability is legally insufficient."  *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010) (internal quotations omitted).  "When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer."  *Id.*  "Non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence."  *Id.* at 534.  Expert testimony is necessary when there are multiple potential medical causes of an injury.  *Id.* (finding that expert testimony is required to determine whether an infection was caused by omitted antibiotics or other infections (citing *Kaster v. Woodson*, 123 S.W.2d 981, 983 (Tex. Civ. App.—Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."); *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony.  There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper

to be submitted to the jury.")).

In this case, expert testimony is required because there are many potential causes of Yates-Williams's infections.  Under Texas law, a jury cannot determine whether CSMC is liable to the plaintiffs without reliable, admissible expert testimony.

### B.    Rule 702[5]

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence Rule 702.  *See Simpson v. James*, 903 F.2d 372, 378 n.20 (5th Cir. 1990); *Edwards v. Sears*, *Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975).  Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Under Rule 702, the court must determine whether a proposed expert witness has training or experience sufficiently related to the issues and evidence before the court for the expert's testimony to assist the trier of fact.  *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562-63 (5th Cir. 2004).  The district court must make a "'preliminary assessment of whether that

---

[5]  The plaintiffs argue that this court has ruled on the admissibility of their experts' testimony.  In a previous opinion, this court found that the experts' reports met the requirement of Section 74.351 of the Texas Civil Practice and Remedies Code which requires Texas medical-malpractice plaintiffs to produce an expert report within 120 days after filing a petition.  *Yates-Williams v. Nihum*, 268 F.R.D. 566 (S.D. Tex. 2010).  The expert report must "must inform the defendant of the specific conduct called into question and provide a basis for the trial court to conclude that the claims have merit."  *Id.* at 571.  This court found only that the expert reports met those requirements.  It did not find that the expert reports met Rule 702 standards.

reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology can be applied to the facts at issue.'" *Skidmore v. Precision Printing & Packaging*, *Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93, 113 S. Ct. 2786 (1993)).  The court "must ensure the expert uses reliable methods to reach his opinions."  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

"Many factors bear on the inquiry into the reliability of scientific and other expert testimony."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).  In *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court offered an illustrative, but not exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony.  These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.  509 U.S. at 593.  "In the later case of *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the *Daubert* analysis is a 'flexible' one and that 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'"  *Pipitone*, 288 F.3d at 244 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167 (1999)).  "The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Id.* (quoting *Kumho Tire*, 526 U.S. at 152).

An expert's opinions must also "be relevant to the facts of the case."  *Guy*, 394 F.3d at 325.  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that

is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. "A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence." *Pipitone*, 288 F.3d at 245.

The Fifth Circuit's decision in *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) is instructive on the proper application of *Daubert* and *Kumho Tire*. In *Pipitone*, the plaintiff developed a salmonella infection in his knee after a physician injected him with Synvisc, a product manufactured by Biomatrix. Synvisc is a replacement synovial fluid made from rooster combs. *Id.* at 241. The plaintiff's treating physician, Dr. Millet, administered Synvisc after other fluid injections had failed to stop pain in the plaintiff's knee. The plaintiff sued Biomatrix, alleging that it provided him with a does of Synvisc contaminated with salmonella. The Fifth Circuit reviewed the district court's exclusion of the plaintiff's two experts, Doctors Millet and Coco, as unreliable under *Daubert*. *Id.* at 243. Both doctors testified that the plaintiff's injuries were caused by a contaminated Synvisc injection.

The Fifth Circuit upheld the exclusion of Dr. Millet's testimony. Dr. Miler was the plaintiff's treating physician. He was an orthopedist who specialized in joints and received one year of specialized training in joints at John Hopkins University. The record showed that he been performing knee injections for twenty years. During his deposition, Dr. Millet testified that "it was as likely as not that the Synvisc syringe that he administered to [the plaintiff] contained the salmonella bacteria that infected Pipitone's knee." *Id.* at 245. Dr. Millet testified that he had no "scientific evidence" to support the conclusion that it was more likely than not that the injection contained the salmonella and he also testified that he would defer to Dr. Coco, an infective disease

16

specialist, for any other explanation as to how the joint became infected.  The court, citing Rule 702's requirement that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue," reasoned that expert testimony "must not only be reliable, but also must be relevant to the issue of causation of the salmonella infection."  *Id.*  The court reasoned—citing Federal Rule of Evidence 401's statement that "relevant evidence" tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" —that "[a] perfectly equivocal opinion" is irrelevant because it "does not make any fact more or less probable."  *Id.*; *see also Bland v. Verizon Wireless, LLC*, 538 F.3d 893, 898 (8th Cir. 2008) (upholding exclusion of expert's testimony that the plaintiff's exposure to freon caused asthma because the proximity in time between the exposure and asthma was the only basis for the testimony and the expert failed to investigate other possible causes); *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 450 (6th Cir. June 29, 2007) (upholding exclusion of expert's testimony because the expert identified 16 possible causes which showed that the expert's testimony was "conjecture and speculation," even though all 16 causes were consistent with the defendant's alleged negligence ); *United States v. Fleet Mgmt., Ltd.*, 332 F. App'x 753, 756 (3d Cir. May 28, 2009) (excluding expert testimony because "[s]imply stated, [the expert's] reasoning did not rule out other possible causes, or provide an intelligible response as to why it was not the actual cause"); *Bro-Tech Corp. v. Purity Water Co. of San Antonio*, 2009 WL 1748539, at *8 (W.D. Tex. June 19, 2009) (excluding expert's testimony because he admitted "that other potential causes exist and their effect cannot be determined absent additional information and testing"); *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 598 (N.D. Fla. 2009), *aff'd* 609 F.3d 1183 (11th Cir. 2010) (excluding expert's testimony on the cause of the plaintiff's autism because "[g]iven the plethora of genetic theories for autism, 'ruling out'

17

[one possible cause] . . . far from eliminates all genetic causes of his ASD, let alone the other multitude of factors that have been linked to autism or ASD").   Because Dr. Millet could not conclude that the Synvisc injection more likely than not caused the plaintiff's infection, the Fifth Circuit upheld the district court's exclusion.

By contrast, the Fifth Circuit found that the district court abused its discretion in excluding the testimony of Dr. Coco.  Dr. Coco was asked by Dr. Millet to examine the plaintiff after he found salmonella in fluid taken from the plaintiff's knee.  Dr. Coco confirmed that the fluid contained salmonella.  Dr. Coco specialized in infectious diseases.  The district court found he had "great expertise in the area of epidemiology and infectious diseases." *Pipitone*, 288 F.3d at 245.  Despite Dr. Coco's expertise, the district court excluded Dr. Coco's testimony because he: (1) performed no epidemiological study; (2) acknowledged that his search of scientific literature did not report a salmonella infection from a contaminated injectable knee product such as Synvisc; and (3) failed to eliminate other viable causes of the infection.  The Fifth Circuit rejected the district court's conclusions.  It accepted Dr. Coco's explanation that he did not perform an epidemiological study because such studies are not appropriate when there is only one instance of infection.  The court also found that Dr. Coco's search of scientific literature supported his conclusion.  The record showed that Dr. Coco excluded Synvisc from his search because Synvisc is the only injectable knee product made from chicken parts and Dr. Coco was trying to determine whether a salmonella infection had ever resulted from a non-chicken-part-based product injection.  If such infections had occurred, it would show that the plaintiff's infection could have resulted from other knee injections the plaintiff received.  Finally, the court found that the record showed that Dr. Coco had, in fact, "methodically eliminated the alternative sources of the infection as viable possibilities."  *Id.* at 248.

18

Having rejected the bases for the district court's decision, the Fifth Circuit evaluated Dr. Coco's testimony under *Daubert* and found it admissible. Noting Dr. Coco's extensive experience treating infectious diseases, his academic appointment in a university's Department of Infectious Diseases, and his publications in the area, the Fifth Circuit gave weight to Dr. Coco's personal experiences as a specialist. Though there was no scientific literature documenting salmonella infections caused by knee injections, the court found Dr. Coco's hypothesis that the plaintiff's infection more likely than not resulted from a Synvisc injection reliable, based on Dr. Coco's "first-hand observations and professional experience in translating these observations into medical diagnoses." *Id.* at 246. The court emphasized that personal experience may qualify an expert under Rule 702. It pointed to the Supreme Court's statement in *Kumho Tire* that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience," 526 U.S. at 156, and to the Advisory Committee's statement that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Id.* at 247.

The Fifth Circuit recognized limits to expert testimony based on experience: it must be "supported by solid evidence in the scientific community," and the district court still "must probe into the reliability of [the testimony's] bases." *Id.* But, after probing into the bases of Dr. Coco's testimony, it found that his testimony was supported by the scientific community because Dr. Coco based his testimony "in large part on accepted medical knowledge of the ways in which salmonella functions as an organism and how it infects humans" and because Dr. Coco's eliminations of other causes "were based on generally accepted diagnostic principles related to these conditions." *Id.* at

19

246.  Based on these findings, it reversed the district court.

The Fifth Circuit concluded by admonishing the district court that the trial court "is not intended to serve as a replacement for the adversary system" and cautioned the district court against transforming "a *Daubert* hearing into a trial on the merits."  *Id.* at 250.

## B.      Analysis

The plaintiffs argue that the expert testimony of Dr. William R. Francis, Dr. Neil K. Kochenour, and Dr. Allan J. Hamilton supports their liability theories.  The plaintiffs argue that Dr. Francis, Dr. Kochenour, and Dr. Hamilton all concluded that CSMC's negligence in failing to provide a reasonably safe operating room or uncontaminated surgical materials caused Yates-Williams's infection.  CSMC argues that the bases for each expert's conclusion are unreliable because they are inconsistent with the generally accepted scientific principle that a patient's skin is the most common source of surgical-site infections after spinal surgeries.  CSMC emphasizes that none of the plaintiffs' experts specialize in infectious diseases.  CSMC also argues that the experts' testimony should be excluded as irrelevant because none of the experts opined that CSMC's negligence more likely than not caused Yates-Williams's infection.  The plaintiffs responded that their experts are "eminently qualified" in their respective fields and each expert's testimony is based on the generally accepted scientific principle that contaminated operating rooms or surgical instructions and materials can cause MRSE infections.

## 1.      Generally Accepted Scientific Principles

Both parties have submitted excerpts from medical textbooks and articles showing the medical community's generally accepted principles related to surgical-site infections.  The literature shows that the following principles are generally accepted:

20

- **Inoculation of pathogens to the surgery wound most likely causes postoperative surgical-site infections in the spine.** *See* THE TEXTBOOK OF SPINAL SURGERY 2173[6] (Keith H. Bridwell, M.D., and Ronald L. DeWald, M.D., eds., 2d ed.) ("Numerous factors in the operating room environment at time of surgery combine to increase the risk of postoperative infection.  The most likely time of inoculation of the wound is during surgery.").

- **The most likely cause of inoculation is direct contamination of the surgery wound with pathogens.** *See* THE TEXTBOOK OF SPINAL SURGERY, *supra*, at 2171 ("However, in the postoperative setting, the most likely source is direct contamination that occurs during the operative procedure."); Charles E. Rawlings III and Robert H. Wilkins, *Postoperative Intervertebral Disc Space Infections*, *in* NEUROSURGERY (2d ed., Robert H. Wilkins, M.D., and Setti S. Rengachary, M.D., eds.) ("Postoperative disc space infections occur not by hematogenous spread but by direct inoculation of organisms into the disc space by surgical procedure.").[7]

- **The patient's skin is a major source of pathogens that can contaminate a surgery wound.** *See* Rabih O. Daouiche, M.D., *et al.*, Abstract, *Chlorhexidine-Alcohol Versus Povidone-Iodine for Surgical-Site Antisepsis*, 362 New. Eng. J. Med., no. 1 (abstract) (January 2010) ("Since the patient's skin is a major source of pathogens that can cause surgical-site infection, optimization of preoperative skin antisepsis may decrease postoperative infections.");[8] Alicia J. Mangram, M.D., *et al.*, *Guideline for Prevention of Surgical Site Infection, 1999*, 20 INFECTION CONTROL AND HOSPITAL EPIDEMIOLOGY, no. 4, 1999 at 253 ("For most SSIs, the source of pathogens is the endogenous flora of the patient's skin, mucous membranes, or hollow viscera.");[9] A. Tammelin *et al.*, Abstract, *Source and Route of Methicillin-Resistant* Staphylococcus epidermidis *Transmitted to the Surgical Wound During Cardio-Thoracic Surgery*, 47 J. OF HOSPITAL INFECTION, issue 4, (April 2001) ("The patients' sternal skin was the main source for wound contamination with MRSE.").[10]

- **Other sources of infecting pathogens include: surgical personnel; the operating room environment (including air); and tools, instruments and materials brought into the operating room.**  Mangram *et al.*, *supra*, at 254 (listing these sources); *see also* Nitin Tandon and Dennis G. Volmer, *Infections of the Spine and Spinal Cord*,

---

[6]   (Docket Entry No. 116-21).

[7]   (Docket Entry No. 116-27).

[8]   (Docket Entry No. 99-17).

[9]   (Docket Entry No. 99-16).

[10]   (Docket Entry No. 99-18).

*in* YOUMAN'S NEUROLOGICAL SURGERY 4364 (5th ed., H. Richard Winn, M.D., ed.) ("Infective organisms can be carried to the spine by four routes: via the arterial blood supply, retrograde by the vertebral venous plexus, by direct inoculation (e.g., a contaminated surgical instrument or needle or a penetrating injury), or direct extension from an adjacent nidus of infection . . . .  Most infections probably occur by the first of these routes.").[11]

## 2.   Dr. Francis

Dr. Francis is a board-certified orthopedic surgeon specializing in spinal surgery.  He has served as a Clinical Assistant Professor at the Baylor College of Medicine and the University of Texas Medical Branch.  Dr. Francis has been the director of the Spine Fellowship Programs in the orthopedic surgery divisions of both Baylor College of Medicine and the University of Texas Medical Branch. (Docket Entry No. 116-7, Dr. Francis Curriculum Vitae).  Dr. Francis's curriculum vitae show numerous publications related to orthopedics, all of which occurred before 1988.  The record shows that on November 21, 2007, the Texas Medical Board ordered that Dr. Francis  stop performing orthopedic surgeries after a series of complaints.  (Docket Entry No. 99-4, Dr. Francis Depo., 70–72, 98–99).  The record showed that Dr. Francis had to stop performing surgeries because of a medical problem, not because of a lack of knowledge or skill.

Dr. Francis has submitted two reports.  In his first, Dr. Francis stated his opinion that Yates-Williams's spine was infected during her July 25 surgery with a strand of MRS bacteria.  Based on his understanding that "[t]he most likely vehicles for such intra operative contamination include surgical instruments, surgical solutions, and/or other surgical materials that are used in the normal course of performing a laminectomy/discectomy," Dr. Francis concluded that CSMC had failed to provide properly sterilized surgical materials.  (Docket Entry No. 99-3, Dr. Francis Expert Report

---

[11]   (Docket Entry No. 116-22).

I).  Dr. Francis's second expert report specified that the infecting agent was MRSE.  The second expert report also elaborated on the bases for his conclusions.  Citing the *Textbook of Spinal Surgery and Neurosurgery*, he noted that "the most likely cause of such infections is direct contamination that occurs during the surgery."  *See* THE TEXTBOOK OF SPINAL SURGERY, *supra*, at 2171 ("However, in the postoperative setting, the most likely source is direct contamination that occurs during the operative procedure.").  Without citing additional authority, Dr. Francis stated that the "two main mechanisms that allow [] direct contamination [during surgery] are surgical instruments and/or surgical solutions that are contaminated with bacteria," and concluded that contaminated surgical instruments or solutions caused Yates-Williams's infection.  (Docket Entry No. 99-2, Dr. Francis Expert Report II).

Dr. Francis's opinions are not reliable.  One important basis for Dr. Francis's opinions was that the "two main mechanisms that allow [] direct contamination [during surgery] are surgical instruments and/or surgical solutions that are contaminated with bacteria."  (*Id.*).  Dr. Francis did not cite or provide any literature supporting this claim.  He testified at his deposition that this conclusion was based on his professional experience that "the skin is not the major cause."  (Docket Entry No. 99-4, Francis Depo., 153).  An expert's professional experience can reliably support his opinion, but the opinion must be "supported by solid evidence in the scientific community"; the district court "must probe into the reliability of [the testimony's] bases."  *Pipitone*, 288 F.3d at 247, 246–47.

Dr. Francis's opinion and professional experience are contrary to generally accepted scientific principles, and he did not provide a basis for deviating from these principles.  *Daubert*, 509 U.S. at 593.  Dr. Francis admitted that the "most common source of MRSE is from the patient's

skin flora;" that Yates-Williams likely had MRSE present both on and just underneath her skin; and that the medical community and literature recognize that a patient's skin—and not contaminated surgical instruments or solutions—is the most likely source of MRSE infection.  (Docket Entry No. 99-4, Francis Depo., 144–46).   Dr. Francis also explicitly admitted that his opinion that contaminated surgical instruments or solutions is a primary source of pathogens causing surgical-site infections is not generally accepted in the scientific community.  He testified as follows:

> A:      I'm sorry.  I actually felt like the most common source of inoculating a surgical wound is either through a break of sterility, which is sterilizers, soft goods, solutions that are introduced into the wound, because in my experience the skin is not a major cause.  I understand what the guidelines say, but if we followed all the guidelines, whatever is on the skin, we'd have two-thirds of our patients that we operated on infected.
>
> . . . .
>
> Q:      You've clearly . . . just testified that not only the medical literature states but you agree with the concept that most [surgical-site infections] are caused by the patient's skin flora, correct?
>
> A:      Yes.
>
> Q:      And you also agree that risk is even elevated when we're talking about health care workers, correct?
>
> A:      Yes.
>
> Q:      Okay.  And so the concept that the two main mechanisms— you would agree that main equals primary?
>
> A:      Yes.
>
> Q:      The concept that the two main mechanisms that allow such contamination that allow such contaminations are surgical instruments and/or solutions doesn't comport with your testimony here today or the medical literature, correct?
>
> A:      Correct.

24

(Docket Entry No. 99-4, Francis Depo., 154).

Dr. Francis also admitted that his opinion that contaminated surgical solutions caused Yates-Williams's injury is not reliable.  When questioned about testimony by CSMC's expert, Dr. William Jarvis, that MRSE cannot proliferate in surgical solutions, Dr. Francis testified that he was unfamiliar with that principle, but that he would defer to Dr. Jarvis, an infectious disease expert. (*Id.*, 157).  He was then asked, "[b]ased upon that deferring to them and coming back to your report of January 13, 2010, that would . . . negate your opinions that Ms. Yates's surgical site infection could have been caused by a contaminated surgical solution," and replied, "I think if you build that story then yes."  (*Id.*, 157–58).[12]

Dr. Francis did not testify that contaminated surgical materials or solutions or an unsafe operating room more likely than not caused Yates-Williams's infection.[13]  *Pipitone*, 288 F.3d at 245. During his deposition, Dr. Francis listed numerous potential sources of MRSE, including: (1) improper sterilization; (2) malfunctioning sterilization equipment; (3) contaminated surgical drapes; (4) contaminated surgical gowns; (5) contaminated surgical materials, such as sponges and surgical pads; (6) contaminated surgical tools; (7) contaminated surgical solutions; (8) a breach of the sterile

---

[12]    During his deposition, Dr. Francis was questioned about whether surgical instruments from an obstetric surgery in which the plaintiff later developed MRSE were used in Yates-Williams's surgery. (Docket Entry No. 99-4, Dr. Francis Depo., 296–300).  The plaintiffs do not advance this theory in their response.  Even if they did, Dr. Francis testified that he had no evidence to support this claim and that it would be "speculation" for him to say that the MRSE strain on the obstetric patient was the same as the MRSE found in Yates-Williams.  (*Id.*, 308).

[13]    The plaintiffs argue that Dr. Francis testified that "a basis for his opinions is the fact that the infection in question was in the deep disc space, and not in the skin or subdrual tissue between the skin and the pocket of deep tissue infection" and that "[h]e explained that if the contamination came from Yates['s] own skin flora, that there would not have been infection in the skin and subcutaneous tissue."  (Docket Entry No. 116, at 16).  Dr. Francis did not state this; Dr. Kochenour did.  (Docket Entry No. 99-12, Dr. Kochenour Depo., 58–59).  His testimony is addressed below.

field; (9) persons coming in and out of the operating room such as nurses;[14] and (10) air contamination.  Some of these potential causes are consistent with the plaintiffs' theories of liability—that contaminated surgical materials or solutions or an unsafe operating room caused Yates-Williams's infection—and some are not.  (Docket Entry No. 99-4, Dr. Francis Depo., 107–09, 115, 310, 312).  A breach of the sterile field during surgery, persons coming in and out of the operating room, and contaminated surgical gowns are all inconsistent with the plaintiffs' liability theories.  Dr. Francis admitted that he could not testify with a reasonable degree of medical probability that any of the potential causes were more likely than another.  (*Id.*, 110, 112–13, 115, 312–13).  Dr. Francis also admitted that he could not testify as to whether CSMC more likely than not breached its standard of care.  He testified as follows:

> Q:     [B]ased on the medical causation opinions that you've given or that you've agreed with the patient's skin flora is the most common cause of a surgical site infection, would you agree that College Station Medical Center did not breach the standard of care in failing to provide surgical instruments? . . . .
>
> A:     Well, we don't know that.  I don't know that they did or did not.  I'm just reiterating that that's a potential cause of infection, the operating room.

(*Id.*, 159).  Dr. Francis gave similar testimony elsewhere in his deposition.  When asked "You would agree that a surgical infection can occur and actually most often occurs in the absence of negligence, correct?" he responded "[i]f you use most I'd agree with that."  (Docket Entry No. 99-4, Dr. Francis Depo., 31).

Dr. Francis did offer additional reasons for his opinion that CSMC's negligence more likely

---

[14]   There was also testimony by Dr. El Nihum that the MRSE causing Yates-Williams' infection could have come from him.  (Docket Entry No.  99, Ex. 8, Dr. El Nihum Depo., 221).

than not caused Yates-Williams's infection, but unlike Dr. Coco in *Pipitone*, he did not provide reliable bases for these reasons.  Dr. Francis pointed out that evidence showing that Yates-Williams received a surgical scrub before treatment supported his conclusion.  (*Id.*, 150).  But he did not provide any basis for his opinion that because Yates-Williams received a surgical scrub, the cause of her infection was more likely than not contaminated surgical materials or solutions or an unsafe operating room.  Medical literature cited by both parties states that significant bacteria remains even after such scrubs.  The Textbook of Spinal Surgery, *supra*, at 2173 ("Despite efforts at decontamination of the cutaneous surface, up to 20% of the total microbial flora of the skin is located within sebaceous glands and hair follicles beneath the skin surface.").

Citing testimony from Dr. El Nihum, the plaintiffs point out that such surgical scrubs advertise themselves as being "99.9% effective against infective organisms."[15]  (Docket Entry No. 116, at 16); (Docket Entry No. 116-26, Dr. El Nihum Depo., 223).  But Dr. El Nihum did not testify that scrubs *are* 99.9% effective against infective organisms; he testified that such scrubs only "reduce the number of bacteria on the skin."  (Docket Entry No. 116-26, Dr. El Nihum Depo., 223).  Dr. Francis also acknowledged that surgical scrubs do not sterilize the skin.  (Docket Entry No. 99-4, Dr. Francis Depo., 150, 305).

Dr. Francis's opinion that because Yates-Williams received a surgical scrub, it is more likely than not that the Med's negligence caused her infection is further weakened because Dr. Francis deferred to Dr. Jarvis's testimony that one of these causes — surgical solutions — likely did not cause Yates-Williams's infection.

---

[15]  The plaintiffs have not submitted any evidence, or even advertising materials, stating that surgical scrubs are 99.9% effective against infective organisms.

As an experienced orthopedic surgeon, Dr. Francis may have experience diagnosing and treating postoperative spinal infections. But his professional experience does not provide a basis to deviate from the generally accepted scientific principle that a patient's skin is often the MRSE source. The qualifications in *Pipitone* that made Dr. Coco's experience-based testimony admissible are not present. Dr. Francis is not an infectious disease specialist, nor does he have any publications or professorships related to infectious-disease treatment. (Docket Entry No. 116-7, Dr. Francis Curriculum Vitae). Dr. Francis's qualifications are more like Dr. Millet's, the doctor whose exclusion the Fifth Circuit upheld in *Pipitone*. Like Dr. Millet, Dr. Francis specializes outside of infectious-disease. *Id.* at 245. Also like Dr. Millet, Dr. Francis admitted that he did not have "experience in microbiology of bacteria such as MRSE" and that he would defer to an infectious disease expert on certain issues. (Docket Entry No. 99-4, Dr. Francis Depo., 157).

The plaintiffs argue that testimony by Dr. Jonathan Friedman, a board-certified neurosurgeon employed by CSMC, shows that Dr. Francis relied on reliable bases in concluding that the hospital's negligence more likely than not caused Yates-Williams's infection. His testimony on the cause of Yates-Williams's infection does not show that Dr. Francis had a reliable basis for his conclusion that contaminated surgical instruments or solutions or an unsafe operating room caused Yates-Williams's infections. Dr. Friedman only acknowledged that Yates-Williams's infection likely resulted from contamination with MRSE during surgery and that such contamination *can* occur from instruments that are contaminated. (Docket Entry No. 116-31, Dr. Friedman Depo., 123). The issue is not whether Yates-Williams's infection occurred during surgery or whether contaminated surgical instruments can cause MRSE infections. The issue is whether contaminated surgical instruments likely caused Yates-Williams's infection. Dr. Friedman's testimony does not support Dr. Francis's

conclusion.[16]

The plaintiffs also point to testimony from Dr. Lemos that the theory that bacteria from Yates-Williams's skin caused her infection is speculative to show that Dr. Francis's conclusions are reliable. Dr. Lemos testified that it was more likely that Yates-Williams's infection was caused by MRSE from her own skin than from contaminated surgical instruments or solutions, though he thought both theories were speculative. He testified as follows:

> Q:    If the jury is to go along with Dr. El Nihum that the most likely time of inoculation was at the time of the surgery, then we've gone through the types of things that could cause that. That would be instruments, solutions, or other materials put into the disc space that had MRSE on it?
>
> . . . .
>
> A:    No, I don't. I think that's very unlikely.
>
> Q:    If it got contaminated at the time of the operation during the surgery on July 25, how could that have occurred?
>
> A:    More likely is—is when you cut the skin bacteria are in areas that deep in recesses of the skin that are not reached by the methods used to try to achieve adequate antisepsis and—even intracelluarly. And that's the more—more likely. If you were to speculate about an intraoperative approach, that would be the more likely one. Not from an exogenous material or substance, but from the patient's own skin.
>
> Q:    Okay.
>
> A:    —in those deep recesses. But that's speculative you know.
>
> . . . .
>
> Q:    So when you say bacteria from her own skin being dragged into the surgical site, that's speculative?

---

[16]  The only evidence submitted by the parties as to whether the surgical instruments used in Yates-Williams's surgery were sterilized shows that they were. (Docket Entry No. 99, Ex. 21).

A:       Right.

(Docket Entry No. 118-2, Dr. Lemos Depo., 91–93).[17]

Dr. Francis's deposition shows he can offer only a "perfectly equivocal" opinion. Such opinions are inadmissible under *Pipitone*. 288 F.3d at 245. Dr. Francis's expert testimony that the cause of Yates-Williams' infection was contaminated surgical instruments or solutions or other operating room materials is excluded.[18]

### 3.       Dr. Kochenour

Dr. Kochenour is a board-certified obstetrician-gynecologist. He is a professor emeritus in the University of Utah's Department of Obstetrics and Gynecology and the Medical Director of the University Hospital at the University of Utah from 1994 until 2006. Dr. Kochenour was appointed Medical Director of the University Hospital at the University of Utah in 1994. While he served as director, the University Hospital's infection-control group reported to him. Dr. Kochenour has an extensive list of publications all of which appear related to obstetrics and gynecology. (Docket Entry No. 116-13, Dr. Kochenour Curriculum Vitae). In his expert report, Dr. Kochenour stated that "[t]he most likely mechanism for [Yates-Williams's infection] was that the surgical instruments, surgical solutions, and/or other surgical materials that were in contact with the L5/S1 disc interspace

---

[17]    When informed that Yates-Williams received surgical scrubs before surgery and of other efforts made to minimize infection risk during surgery, Dr. Lemos's opinion did not change. (Docket Entry No. 118-2, Dr. Lemos Depo., 93–95).

[18]  To the extent the plaintiffs argue that testimony by Dr. El Nihum supports their liability theories, this court already struck Dr. El Nihum's testimony and opinions on (1) MRSA and MRSE in surgical proceedings; (2) the appropriate standard of care for hospitals with respect to infectious-disease prevention and reduction efforts including whether CSMC should have informed patients of CSMC's 2008 MRSA infection rate; (3) whether CSMC's MRSA infection rate constituted an outbreak; and (4) the cause of the plaintiff's surgical-site infection. (Docket Entry No. 93).

were contaminated." (Docket Entry No. 116-4, Dr. Kochenour Expert Report). He also stated that "[t]he surgical instruments, surgical solutions, and/or surgical materials that were provided were contaminated with multi-drug resistant Staphylococcus bacteria." (*Id.*).

During his deposition, Dr. Kochenour testified that the basis for his conclusion that Yates-Williams's MRSE infection was caused by surgical materials or solutions was based on the size of the inoculation required for infection and that there were no infections in subcutaenous regions of the skin. He testified:

> I think for her to get infected with an organism that is not typically infected—she had to get a pretty large inoculum. I don't see any major factors in her that would have accelerated—increased her chance for infection. And her skin was prepped in a routine way, her—she was given her prophylactic antibiotics an, and the superficial cultures that were done were not—did not show any growth. And so my conclusion from that is that this was introduced deep into the incision in a sizable enough inoculum to cause that infection, but not—but it wasn't superficial.
>
> The cultures taken at the time of the second surgery that were superficial were negative, so if it had been introduced from the skin, say on a scalpel or something like that, I would have anticipated the superficial to be infected also and, in fact, the cultures were negative and a superficial infection was a very late—I mean, there's some difference about how/when she had redness, but the skin healed itself, so it wasn't infected right immediately after surgery.
>
> So I think the weight of evidence, certainly to a medical probability is that it was inoculated deep into it and in sufficient numbers to cause an infection with an organism that is not typically a pathogen like this.

(Docket Entry No. 99-12, Dr. Kochenour Depo., 58–59). Dr. Kochenour admitted during his deposition that his theory was his "own construct." (*Id.*, 59). He did not cite any medical literature or research in support of his opinion. To the contrary, he acknowledged that he had not done any independent research on this case and that he had not consulted with any doctor, including

infectious-disease specialists and neurosurgeons.  (*Id.*, 47–48).

Dr. Kochenour's general medical experience may still qualify him to render an opinion, but this court must still determine whether his medical experience is a reliable bases for his conclusion. *Pipitone*, 288 F.3d at 246–47.  Dr. Kochenour's deposition shows that his professional experience as an obstetrician, gynecologist, and medical director of a hospital does not provide a reliable basis for his opinions.  He acknowledged that he is not an expert in neurosurgery or infectious diseases. Nor has he published any research in either area of expertise.  (*Id.*, 16, 24, 48).  He also acknowledged that he had not performed a laminectomy or a fusion and that while he has had patients develop surgical-site infections, he has never treated a patient with MRSE.  (*Id.*, 52). Though Dr. Kochenour has experience working with infection-control committees, he has no formal training in infection control and the only training in infectious disease he has was "a six-week elective" he took in medical school.  (*Id.*, 53–54).

Dr. Kochenour's testimony also shows that the basis for his opinion is inconsistent with generally accepted medical principles.  He acknowledged that it was "his own construct" that pathogens are most likely introduced from contaminated surgical materials or solutions.  (*Id.*, 60). When asked whether he could refer to any scientific literature to support his contention, he stated that "for gynecologic surgery, it is not usually the patient's own skin flora."  (*Id.*, 84).  This testimony is contrary to the generally accepted scientific principle that for spinal surgery, the patient's own skin is the most likely source of pathogens.  Dr. Francis's testimony that for gynecology, the patient's skin is usually not the source of pathogens does not provide a reliable basis to conclude that for spinal surgery, the source of pathogens is not usually the patient's skin.

Like Dr. Francis, Dr. Kochenour showed a willingness to defer to experts on whether MRSE

can proliferate in surgical solutions.  When asked whether he would "agree with data that indicate that MRSE does not contaminate surgical solutions," Dr. Kochenour responded, "I wouldn't be willing to say that [because] I don't know one way or another."  (*Id.*, 81).  When asked whether "[i]f somebody says that solutions don't—that is not an environment in which MRSE proliferates, you'd be open to saying—taking that out of the mix potentially," and responded, "[c]orrect."  (*Id.*, 82). This undermines the bases of Dr. Kochenour's conclusion that contaminated surgical materials or solutions caused Yates-Williams's infection.

Dr. Kochenour's testimony also shows that he cannot provide a reliable basis to exclude other possible causes of Yates-Williams's infection, such as her skin.  *Pipitone*, 288 F.3d at 246–47. Though the scientific literature submitted by both parties shows that there are causes for surgical-site infection other than a patient's skin or contaminated surgical materials or solution, *see, e.g.*, *Mangram et al.*, *supra*, at 254, Dr. Kochenour did not consider other causes such as other hospital personnel or airborne pathogens.  (Docket Entry No. 99-12, 82–83).  Dr. Kochenour stated that he did not consider other possible sources of infection because of the size of the inoculum required to infect Yates-Williams, but aside from his assertion, did not provide any reliable basis that the size of the inoculum excludes these possibilities.  As noted, his professional experience is insufficient to establish reliability.

Dr. Kochenour based his exclusion of the skin as a possible source on evidence that the skin was not infected after surgery and because a surgical scrub was performed.  Like Dr. Francis, Dr. Kochenour acknowledged that surgical scrubs do not completely sterilize the skin.  He failed to provide any bases for his opinion that because Yates-Williams received a surgical scrub, the cause of her infection was more likely than not contaminated surgical materials or solutions or an unsafe

operating room.  As to his theory that the absence of skin infection shows that skin flora was not the source of the infection, Dr. Kochenour admitted that it was "his own construct," and did not offer any reliable bases to support his conclusion.  Like Dr. Francis, Dr. Kochenour is similar to Dr. Millet in *Pipitone*.  The basis for his exclusion of Yates-Williams's skin as the source of the MRSE is similarly unreliable.  Dr. Kochenour is not an infectious-disease specialist, has minimal formal training in infectious disease, has no experience treating MRSE, and admitted that he would defer to an infectious-disease expert on certain issues.  Under *Pipitone*, his testimony is properly excluded as irrelevant.

Dr. Kochenour's testimony that contaminated surgical materials or solutions caused Yates-Williams's infection is excluded.[19]

### 4.     Dr. Hamilton

Dr. Hamilton is a board-certified neurosurgeon and a professor in the department of neurosurgery at the University of Arizona.  (Docket Entry No. 116-10, Dr. Hamilton Curriculum Vitae).  Dr. Hamilton submitted two expert reports for the plaintiffs.  (Docket Entries No. 99-13, Dr. Hamilton Expert Report I; 99-14, Dr. Hamilton Expert Report II).  The plaintiffs claim that Dr. Hamilton testified that "the L5-S1 disc space became contaminated with MRSE due to surgical instruments, surgical solutions, and/or materials brought into the disk space."  (Docket Entry No. 116-3).  The plaintiffs also claim that Dr. Hamilton excluded the possibility that Yates-Williams's skin was the source of her MRSE because "[h]e explained that if the contamination came from Yates own skin flora, that there would have been an infection in the skin and subcutaneous tissue."  (*Id.*).

---

[19]   The plaintiff raises many of the arguments raised in response to the Med's motion to exclude Dr. Francis; in fact, the response to the motion to exclude Dr. Kochenour is almost identical to the response to the motion to exclude Dr. Francis.  These arguments fail for the same reasons discussed above.

The plaintiffs' characterization of Dr. Hamilton's opinion is inconsistent with his expert report and with his deposition.  Neither expert report submitted by Dr. Hamilton states that contaminated surgical materials or an unsafe operating room caused Yates-Williams's infection. As to CSMC, Dr. Hamilton's expert report states only that its infection-control efforts did not meet the standard of care and that CSMC should have informed its patients and physicians of its surgical-site infection rate.  (Docket Entry No. 99-14, Dr. Hamilton Expert Report II).  As discussed above, CSMC is entitled to summary judgment on these liability theories because the plaintiffs have produced no evidence of malice.

Dr. Hamilton's deposition testimony further demonstrates that his expert opinion does not support the plaintiffs' liability theories.  Dr. Hamilton testified that he could not, within a reasonable medical probability, testify that contaminated surgical materials caused Yates-Williams's infection. He testified as follows:

> Q:    In all reasonable medical probability, was there [an individual with MRSE who shed MRSE onto the surgical site] in the operating room?
>
> A:    I don't know.
>
> Q:    Was there a problem with surgical solutions?
>
> A:    I don't know.
>
> Q:    Was there a problem with surgical instruments?
>
> A:    I don't know.
>
> Q:    In all reasonable medical probability, identify for me the mechanism by which she became infected, how exactly that happened.
>
> A:    I don't know.

(Docket Entry No. 99-15, Dr. Hamilton Depo., 212–13).[20] Dr. Hamilton also testified that the "most likely of pathogens that caused [Yates-Williams's] infection was most likely from the endogenous flora of her skin," though he stated that he could not say for sure. (*Id.*, 148).

The plaintiffs argue that Dr. Hamilton testified that Yates-Williams's skin could not have caused her MRSE infection because there was not a superficial wound infection. This was not Dr. Hamilton's testimony. Dr. Hamilton testified that if an infection spread from the outer layers of Yates-Williams's skin to the deep wound, he would expect to see tracings of infection from the outer and inner layers. (*Id.*, 205, 216, 219). Dr. Hamilton did not reliably exclude Yates-Williams's skin as a source of her infection.

Dr. Hamilton's expert report and testimony do not provide expert evidence of causation. The plaintiffs have produced no reliable or relevant expert testimony. CSMC's motion for summary judgment is granted.[21]

---

[20]  At a different point during his deposition, Dr. Hamilton made a similar statement. When asked "Do you have an opinion in this case as to what the mechanism was by which the MRSE got into Ms. Yates' wound?", he responded:

> I think there's the possibility, you know, and until you have enough infection control data to really make a conclusion, I can't say to a reasonable medical probability, there is a concern on my part that the rate of infection for elective spinal procedures is too high. That raises the possibility that the infection and contamination of surgical infections, that there are factors within the hospital and, as you pointed out, it could be something like operating room personnel who are colonized with MRSE, could be a systemic thing, ventilation, autoclaves, what, that there may be —that may be playing a role in an increased inoculation rate, if you will, at the time of surgery.

(Docket Entry No. 99-15, Dr. Hamilton Depo., 161–32).

[21]  Because this court grants summary judgment on the plaintiffs' liability theories against CSMC, CSMC's motion to amend its answer, (Docket Entry No. 125), is denied as moot. CSMC's motion to exclude the plaintiffs' theory that Yates-Williams' infection caused diabetes, (Docket Entry No. 126), is also denied as moot because this court determines that CSMC has no liability to the plaintiffs.

**IV.     Conclusion**

CSMC's motions to exclude the opinions of Dr. Francis, Dr. Kochenour, and Dr. Hamilton, (Docket Entries No. 91, 98, 99–102), are granted; CSMC's motion for summary judgment as to the plaintiffs' claim that the hospital's negligence caused Yates-Williams's injuries, (Docket Entry No. 109), is granted; and CSMC's motion for summary judgment as to the plaintiffs' claims related to CSMC's infection-control committee, (Docket Entry No. 129), is granted.  Final judgment will be entered by separate order.[22]

SIGNED on March 24, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[22]  CSMC moved for attorneys' fees on the basis that the plaintiffs' experts have been disqualified.  The plaintiffs did not respond to this argument.  This opinion struck only the experts' opinions as to causation and did not rule on other  parts of the experts' reports.  Because the plaintiffs have not responded to CSMC's motion, this court does not address this issue.  The parties may submit additional briefing.