**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARGO YATES-WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2554 |
| | § | |
| IBRAHIM EL NIHUM, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Dr. Lacrecia Foster and Regional Employee Assistance Program ("READ") moved to exclude the opinions and testimony of Dr. Adam Weinstein and Dr. William Francis, Jr. (Docket Entries No. 92, 113, 114). The plaintiffs responded, (Docket Entry No. 115).

Dr. Foster and READ also moved for summary judgment that it is not liable to the plaintiffs. (Docket Entry No. 123). The plaintiffs responded, (Docket Entry No. 131), and Dr. Foster and READ replied, (Docket Entries No. 139, 145).

Based on the motions, responses, and replies; the summary judgment record; and the applicable law, the motion to exclude the opinions of Dr. Adam Weinstein and Dr. William Francis is granted in part and denied in part. (Docket Entry No. 92). Specifically, the motion to exclude is granted as to Dr. Weinstein's opinions and testimony that:

- delays in Yates-Williams's treatment caused the effects of her spinal infection to become irreversible;

- Dr. Foster's failure to communicate with Dr. El Nihum after Yates-Williams's August 6, 2007 visit with Dr. Foster caused the effects of her spinal infection to become irreversible; and

- Dr. Foster's Bactrim prescription caused the effects of Yates-Williams's spinal infection to become irreversible.

The motion to exclude is denied as to Dr. Weinstein's opinions and testimony that:

- Dr. Foster had a duty to secure Yates-Williams's admission to a hospital on August 20, 2009 and that securing her admission to a hospital would have provided effective treatment.

- Dr. Foster had a duty to communicate to Dr. Friedman the laboratory test and results, which were consistent with the presence of infection, and that had this been done, Dr. Friedman would have treated Yates-Williams more effectively.

As to Dr. Francis, the motion to exclude is granted as to his opinions and tesimony that:

- Dr. Foster's failure to inform Dr. El Nihum on August 20, 2008 caused the effects of Yates-Williams's spinal infection to become irreversible; and

- Dr. Dr. Foster's failure to ensure that Dr. Friedman saw Yates-Williams before August 25, 2008 caused the effects of Yates-Williams's spinal infection to become irreversible.

The motion to exclude is denied as to Dr. Francis's opinions and testimony that:

- Yates-Williams's injuries became irreversible between August 20, 2008 and August 25, 2008; and

- delays in Yates-Williams's treatment caused the effects of Yates-Williams's spinal infection to become irreversible.

Dr. Foster's and READ's motion for summary judgment, (Docket Entry No. 123), is denied.

The reasons for these rulings are explained below.

## I.     Factual Background

On July 25, 2008, Dr. Ibrahim El Nihum performed a hemilaminectomy, a discectomy, and foraminotomy in the L5-S1 vertebral disk space of one of the plaintiffs, Margo Yates-Williams, at College Station Medical Center (CSMC).  After her surgery, Yates-Williams had an infection in her L5-S1 disc space and surrounding spinal cord tissues (the cauda equina), from methicillin-resistant

staphylococci epidermis (MRSE). Yates-Williams's infection was treated surgically until August 31, 2008, despite two additional visits with Dr. El Nihum; two visits to her family physician, Dr. Lacrecia Foster at College Station Family Medical Center (CSFMC); and a visit to Dr. Jonathan Friedman at Texas Brain & Spin. Yates-Williams alleges that the MRSE infection eventually caused cauda equina syndrome, paralysis and weakness in her legs, foot drop, loss of bodily sensation, and dysfunction of her bladder and bowels.

 The plaintiffs — Yates-Williams and her three children —  sued Dr. El Nihum, CSMC, Dr. Foster, CSFMC, Dr. Jonathan Friedman, and Texas Brain & Spine.  (Docket Entry No. 1).  The plaintiffs have settled with Dr. El Nihum and he has been dismissed from the lawsuit. (Docket Entry No. 107).  This opinion addresses the plaintiffs' claims against Dr. Foster and Regional Employee Assistance Program (REAP), who operates CSFMC.

After her surgery, on August 4, 2008, Yates-Williams returned to the emergency department at CSMC.  Yates-Williams alleges that an emergency-medicine doctor performed a physical examination and ran diagnostic testing.  He documented an abscess at the site where Yates-Williams had surgery.  (Docket Entry No. 59, ¶ 30).  Yates-Williams alleges that the emergency-medicine doctor notified Dr. El Nihum of his findings and directed Yates-Williams to Dr. El Nihum.  She alleges that he met with Dr. El Nihum who, without ordering further diagnostic testing, told Yates-Williams that she did not have an infection.  (*Id.*, ¶ 31).  Dr. El Nihum discharged Yates-Williams and instructed her to see a family doctor if her symptoms persisted.

On August 6, 2008, Yates-Williams contacted CSFMC.  Dr. Foster, a board-certified family practice physician, agreed to see her.  During Yates-Williams's visit, Dr. Foster observed a "fever of unknown origin," "lumbosacral pain," and sciatica on Yates-Williams's right side.  (Docket Entry

No. 115-17, CSFMC Medical Records, 7).  Dr. Foster prescribed Yates-Williams a pain killer, Norco, and an antibiotic commonly used to treat urinary-tract infections, Bactrim.  Dr. Foster also ordered an MRI of Yates-Williams's lumbar spine at CSMC.  The MRI was completed the next day. At 10:45 am., the radiologist who interpreted the MRI, Dr. Kenneth Close, told Dr. Foster that the MRI showed that Yates-Williams had an infection requiring prompt surgery.  Dr. Foster told Yates-Williams to return to her neurosurgeon for evaluation of a possible infection.

On August 7, 2008, Yates-Williams again saw Dr. El Nihum.  Dr. El Nihum looked at the MRI and told Yates-Williams that she did not have an infection.  Yates-Williams alleges that Dr. El Nihum "did not offer [Yates-Williams] any treatment or further diagnostic testing," "did not admit [Yates-Williams] to the hospital for close monitoring of suspected abscess," and "did not document whether he evaluated [Yates-Williams] for any signs or symptoms of developing neurological deficits."  (Docket Entry No. 59, ¶ 35).  On August 14, 2008, Dr. El Nihum again met with Yates-Williams and again told her that she did not have any infection.  (*Id.*, ¶ 36).

On August 20, 2008, Yates-Williams returned to Dr. Foster.  Dr. Foster observed a fever and noted that the postoperation MRI showed an infection.  (Docket Entry No. 115-17. CSFMC Medical Records, 6).  Dr. Foster told Yates-Williams that she needed to see a neurosurgeon that day.  Yates-Williams told Dr. Foster that she did not want to see Dr. El Nihum.  Dr. Foster recommended that she go to Dr. Jonathan Friedman at Texas Brain & Spine.

Yates-Williams did not see Dr. Friedman that day.  Dr. Foster testified that she did not make arrangements for Yates-Williams to see Dr. Friedman because she believed Yates-Williams had made the arrangements herself.  (Docket Entry No. 115-16, Dr. Foster Depo., 129–30).  Dr. Foster that if she had known there would be a five-day delay, she would have made alternative medical

4

arrangements.  (*Id.*, 156).  Dr. Foster recognized that Yates-Williams needed to be seen on August 20.

On August 25, 2008, Dr. Friedman saw Yates-Williams.  (Docket Entry No. 59, ¶ 38).  Yates-Williams testified that she told Dr. Friedman (or his physician assistant) that she had improper nerve function (radiculopathy) and incontinence of urine, was stumbling and falling, had a fever, and had increasing pain and weakness.  (Docket Entry No. 113, Ex. B, Dr. Francis Depo., 288–89).  Dr. Friedman ordered additional diagnostic testing and prescribed medication and physical therapy.  He did not admit Yates-Williams to the hospital for monitoring.  Dr. Friedman received the diagnostic results on August 28, 2008.  The plaintiffs allege that based on those results, Dr. Friedman should have ordered prompt intervention.

On August 31, 2008, Yates-Williams arrived at CSMC on a stretcher.  Dr. Lon Young initially examined her, noting that she had cauda equina syndrome and that he suspected a postoperative infection.  (Docket Entry No. 59, ¶ 41).  The same day, Dr. L. Gerard Toussaint performed surgery.  The surgery "evacuated the infected tissues and commenced treatment for the infection." (*Id.*, ¶ 43).  The plaintiffs allege that despite Dr. Toussaint's efforts, Yates-Williams "has continued to suffer from the cauda equina syndrome, including bowel and bladder incontinence, a markedly antalgic gait, positive straight leg on both legs, diminished reflexes at the knees, absent reflexes at the ankles, L5 muscle group weakness on the left, foot drop on the left, numbness on the right thigh distribution, weakness in all myotomes of her legs, and absent reflexes in her legs." (*Id.*, ¶ 44).  Yates-Williams is now in a wheelchair and cannot walk on her own.

The plaintiffs allege that Dr. Foster acted negligently by:

- prescribing Bactrim without supporting laboratory data, which they allege was contraindicated and "mask[ed] presenting signs and symptoms of the surgical-site infection";

- failing to arrange treatment by a neurosurgeon on August 20, 2008;

- failing to ascertain whether Yates-Williams saw a neurosurgeon on August 20, 2008;

- failing to communicate her medical beliefs to Dr. Friedman;

- failing to communicate her medical beliefs to Yates-Williams;

- failing to communicate her medical beliefs to Dr. El Nihum;

- failing to perform reflex or neurological testing to determine if there was nerve responsiveness;

- failing to order additional laboratory tests to detect infection; and

- failing to obtain qualified consulting advice.

(Docket Entry No. 59, ¶ 59(a–f).  The plaintiffs allege that READ is vicariously liable for Dr. Foster's negligence.  (*Id.*, ¶ 62).  To support their negligence claims, the plaintiffs submitted expert reports from Dr. William Francis and Dr. Adam Weinstein.  (Docket Entries No. 115-10, Dr. Francis Expert Report; 115-7, Dr. Weinstein Expert Report).

Dr. Francis is a board-certified orthopedic surgeon specializing in spinal surgery.  He has served as a Clinical Assistant Professor at the Baylor College of Medicine and the University of Texas Medical Branch.  Dr. Francis has been the director of the Spine Fellowship Programs in the orthopedic surgery divisions of both Baylor College of Medicine and the University of Texas Medical Branch.  (Docket Entry No. 115-9, Dr. Francis Curriculum Vitae).  Dr. Francis's curriculum vitae show numerous publications related to orthopedics, all before 1988.  The record shows that on November 21, 2007, the Texas Medical Board ordered that Dr. Francis to stop performing orthopedic surgeries after complaints had been submitted.  (Docket Entry No. 113, Ex. B, Dr.

6

Francis Depo., 70–72, 98–99).  Dr. Francis stopped due to medical issues affecting his ability to

perform surgeries.

In his expert report, Dr. Francis expressed the following opinions:

1. On August 20, 2008, [Dr. Foster] had a duty to personally inform Dr. El Nihum of her concern about [Yates-Williams's] condition and wound site edema, suggestive of a wound infection.  If she had fulfilled this duty, the infection in [Yates-Williams's] L5/S1 disc interspace would not have progressed to causing the cauda equina syndrome, vertebral body erosion, and permanent neurological impairment.

2. On August 20, 2008, [Dr. Foster] had a duty to make certain that [Yates-Williams] be evaluated that day by a neurosurgeon or spinal surgeon.  If she had fulfilled this duty, the infection in [Yates-Williams's] L5/S1 disc interspace would not have progressed to causing the cauda equina syndrome, vertebral body erosion, and permanent neurological impairment.

(Docket Entry No. 115-10, Dr. Francis Expert Report).

Dr. Weinstein is board-certified in internal medicine and has practiced internal medicine

since 2005.  He is a clinical instructor at the University of Texas Health Science Center — Houston

in the department of internal medicine and at Baylor College of Medicine in the department of

family and community medicine.  (Docket Entry No. 115-6, Dr. Weinstein Resume).  In his expert

report, Dr. Weinstein expressed the following opinions:

• It is my opinion that on August 6, 2008, when the patient was initially seen by Dr. Foster, the standard of care required Dr. Foster to communicate with the patient's surgeon regarding the patient's continued issues.  The standard of care certainly required Dr. Foster to communicate with Dr. El Nihum on August 7, 2008, when the results of the MRI were conveyed to her by Dr. Close, the laboratory results were not supportive of a urinary tract infection and Mrs. Yates' lungs were clear.  The failure to communicate with Dr. El Nihum was a deviation from the required standard of care.  The

7

prescription of Bactrim may have been contra indicated at this time, however if an experimental course of the medication was initially prescribed, with appropriate follow up, the medication may been justified.

The standard of care required Dr. Foster to follow up with her patient within two to three days of her commencement of Bactrim DS, to determine if the patient's condition was responding and improving.  In the absence of improvement and in the face of continued pain, fever of unknown origin and surgical site edema, the patient should have been referred for hospitalization, or treatment by an appropriate medical professional after personal consultation with this referral physician.   The standard of care required a follow up discussion with the patient and discontinuation of the Bactrim if the patient was not improving or responding.  The failure to provide follow up care, monitoring and information to Dr. El Nihum or another physician at this juncture, August 9, 2008, or beyond, was a failure to adhere to the required standard of care for patient treatment and continuity of care.

- Dr. Foster's documentation of this visit on the 20th is inadequate and is not complaint with the standard of care in that all pertinent findings, differential diagnosis and physician though process were not documented.  The failure to consult with Dr. Friedman to discuss the patient and the need for the patient to be seen that day is a deviation from the standard of care.   The failure to communicate with Dr. El Nihum to discuss the patient's struggle and her observations to permit intervention by Dr. El Nihum is a deviation from the standard of care.  The failure to assure that the patient was seen on August 20, 2008, by Dr. Friedman was a deviation from the standard of care.  The failure coupled with Dr. Foster's entire failure to follow up with the patient between August 20, 2008 and August 31, 2008, was an absolute failure to provide patient treatment continuity of care and was a deviation from the standard of care that amounts to gross negligence and conscious indifference to the rights and welfare of this patient.

. . . .  The deviations from the standard of care required Dr. Foster in the care and treatment of Margo Yates, commencing with her failure to follow up with the patient on August 9 or 10, 2008, were, in reasonable medical probability, a

> proximate cause of the severe, permanent and disabling injuries from which Margo Yates now suffers and can reasonably be expected to suffer for the remainder of her life.
>
> It is my opinion, in reasonable medical probability, that if appropriate medical intervention had been secured by Dr. Foster for Margo Yates by August 21, 2008, she would not have suffered the injuries described in this report and would not have suffered irreversible damage to the tissue of her cauda equina from an untreated post surgical infection.

(Docket Entry No. 115-7, Dr. Weinstein Expert Report, 9–10).

The plaintiffs also point to testimony from Dr. El Nihum to support their experts' opinions. Dr. El Nihum testified that if Dr. Foster had called him on August 20, 2008 and related that there was "edema around the wound" and "an infection," he would have seen Yates-Williams that day and done "another MRI, another [Complete Blood Count test], another sedimentation rate, [and] another sedimentation rate."  (Docket Entry No. 115-15, Dr. El Nihum Depo., 200).  Dr. El Nihum also testified that he likely would have performed surgery by August 22, 2008 and that he believed, to a reasonable medical probability, that he could have prevented Yates-Williams from developing cauda equina syndrom.  (*Id.*, 206).

Dr. Foster and READ moved for summary judgment that Dr. Foster's negligence did not cause Yates-Williams's injuries.  Dr. Foster and READ argue that the plaintiffs have produced no expert testimony that Dr. Foster's negligence proximately caused the effects of Yates-Williams's spinal infection to become irreversible.  They moved to exclude the opinions and testimony of Dr. Francis and Dr. Weinstein on the basis that the opinions are not reliable under the standards announced by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).  The plaintiffs respond that the expert testimony reliably supports their negligence claims and create a fact issue as to proximate cause.

9

## II.     The Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir.  2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir.  2007).  "This burden will not be satisfied

by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.     Malpractice

"When the negligence alleged is in the nature of medical malpractice, the plaintiff has the burden of proving (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury, and (4) a causal connection between the breach of care and the injury.**"** *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). "It has long been the law in Texas that a plaintiff in a medical negligence case must 'prove by a preponderance of the evidence that the allegedly negligent act or omission was a proximate cause of the harm alleged.'" *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005) (citing *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex. App.—Amarillo 2003). "For the alleged negligence to be a proximate cause of the harm, the harm must have been a foreseeable result of the negligence, and the negligence must have been 'a substantial factor in bringing about the harm, and without which the harm would not have occurred.'" *Id.* (citing *Kramer*, 858 S.W.2d at 400; *Park Place*, 909 S.W.2d at 511; *Archer*, 118 S.W.3d at 782).

"Lay testimony may be used as evidence of causation in certain circumstances, but when expert testimony is required, lay evidence supporting liability is legally insufficient." *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010) (internal quotations omitted). "When lay testimony is

credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer." *Id.* "Non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 534. Expert testimony is necessary when there are multiple potential medical causes of an injury. *Id.* (finding that expert testimony is required to determine whether an infection was caused by omitted antibiotics or other infections (citing *Kaster v. Woodson*, 123 S.W.2d 981, 983 (Tex. Civ. App.—Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."); *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.")).

In this case, expert testimony is required because there is conflicting medical testimony as to when the effects of Yates-Williams's spinal infection became irreversible.

### C.      Rule 702

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence Rule 702. *See Simpson v. James*, 903 F.2d 372, 378 n.20 (5th Cir. 1990); *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion

12

> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

FED. R. EVID. 702. Under Rule 702, the court must determine whether a proposed expert witness

has training or experience sufficiently related to the issues and evidence before the court for the

expert's testimony to assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d

546, 562-63 (5th Cir. 2004).

"Whether an individual is qualified to testify as an expert is a question of law." *Huss v.

Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing FED. R. EVID. 104(a)). "'A district court should

refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a

particular field or on a given subject.'" *Id.* (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir.

1999)). "Rule 702 does not mandate that an expert be highly qualified in order to testify about a

given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by

the trier of fact, not its admissibility. *Id.* (citing *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786

("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence."); *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996) (reasoning that

"most arguments about an expert's qualifications relate more to the weight to be given the expert's

testimony than to its admissibility").

The district court must also make a "'preliminary assessment of whether that reasoning or

methodology underlying the testimony is scientifically valid and of whether the reasoning or

methodology can be applied to the facts at issue.'" *Skidmore v. Precision Printing & Packaging*,

*Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 592–93, 113 S. Ct. 2786 (1993)).  The court "must ensure the expert uses reliable methods to reach his opinions."  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

"Many factors bear on the inquiry into the reliability of scientific and other expert testimony."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).  In *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court offered an illustrative, but not exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony.  These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.  509 U.S. at 593.  "In the later case of *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the *Daubert* analysis is a 'flexible' one and that 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Pipitone*, 288 F.3d at 244 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167 (1999)).  "The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 152).

## III.   Analysis

Dr. Foster and READ argue that they are entitled to summary judgment because the plaintiffs have failed to submit expert testimony showing that, to a reasonable medical probability, Dr. Foster's negligence caused the effects of Yates-Williams's spinal infection to become irreversible. The experts' reports and opinions are discussed below.

### A.    Dr. Weinstein

Dr. Weinstein's expert report identified the following as negligent acts or omissions that fell below the standard of care and caused the effects Yates-William's MRSE infection to become irreversible: the prescription of Bactrim, the failure to follow-up with Yates-Williams after her August 6, 2008 visit; the failure to communicate with Dr. El Nihum on August 7, 2008; and failures, after August 20, 2008, to ensure that Yates-Williams saw a neurosurgeon; to consult with an infectious-disease expert; and to communicate with Dr. El Nihum, Dr. Friedman, or Yates-Williams. In their motion to exclude Dr. Weinstein's opinions and testimony, Dr. Foster and READ argue only that Dr. Weinstein is not qualified to testify and that his opinion that Dr. Foster's negligence was a proximate cause of her injuries is not reliable because he cannot specify when the delay in treating Yates-Williams the spinal infection made the effects irreversible.  Importantly, Dr. Foster and READ do not challenge the following opinions that  Dr. Weinstein expressed:

- Dr. Foster had a duty to secure Yates-Williams's admission to a hospital on August 20, 2009 and that securing her admission to a hospital would have provided effective treatment.  (Docket Entry No. 115-7, Dr. Weinstein Expert Report, 6–7).

- Dr. Foster had a duty to communicate to Dr. Friedman the results of her laboratory findings, which were consistent with the presence of infection, and that if Dr. Foster had communicated these results to Dr. Friedman, Dr. Friedman would have effectively treated Yates-Williams.  (*Id.*, 7).

Dr. Weinstein's report and deposition testimony do not state that Dr. Foster's Bactrim prescription or her failure to follow-up after the August 6, 2008 visit caused Yates-Williams's injuries.  His expert report states only that these failures breached a general practioner's standards of care.  The deposition transcript confirms that any opinion on causation would be speculative.  Dr. Weinstein testified that because Bactrim might have caused short-term relief, it could have "blunted" Dr. El Nihum's assessment of Yates-Williams's condition on August 7, 2008.  He admitted,

15

however, that this was "speculation" because he had no knowledge as to whether Yates-Williams filled the prescription.  (Docket Entry No. 114-2, Dr. Weinstein Depo., 121–22).  Courts "when an expert offers a conclusion based on assumptions unsupported by the facts of the case," that opinion is irrelevant and therefore inadmissible.  *Nunn v. St. Farm Mut. Aut. Ins. Co.*, Civ. Al No. 3:08-CV-1486-D, 2010 WL 2540754, at *9 (N.D. Tex. June 22, 2010) (quoting *Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *6 (N.D. Tex. Jan.14, 2010))

Dr. Weinstein also gave deposition testimony about his opinion that Dr. Foster's failure to communicate with Dr. El Nihum before he saw Yates-Williams on August 7, 2008 visit caused her infection to go untreated.  Dr. Weinstein admitted that when Dr. El Nihum saw Yates-Williams on August 7, he had "a lot of the information he would need" to diagnose an infection.  Dr. El Nihum had results from the MRI and results from blood and urine tests, all consistent with infection.  He also had Yates-Williams's medical records.  (*Id.*, 120).  Dr. Weinstein testified that Dr. Foster still should have communicated her own medical opinion to Dr. El Nihum and that this opinion would have been helpful to Dr. El Nihum.  But when asked "whether a phone call would have changed anything," Dr. Weinstein responded, "I don't know if a phone call would have changed the outcome." (*Id.*, 124).  His deposition shows that this opinion is speculation.

Dr. Weinstein also opined that delays in Yates-Williams's treatment after August 20, 2008 caused her injuries.  The parties do not dispute that by August 25, 2009, Yates-Williams had seen Dr. Friedman, a neurosurgeon.  Dr. Weinstein stated in his report that "if appropriate medical intervention had been secured by Dr. Foster for Margo Yates by August 21, 2008, she would not have suffered the injuries described in this report and would not have suffered irreversible damage to the tissue of her cauda equina from an untreated post surgical infection." (Docket Entry No. 115-

7, Dr. Weinstein Expert Report, 7).  During his deposition, Dr. Weinstein acknowledged that this was speculation.  He testified as follows:

> Q: Do you have any medical literature to support that, that there is a 24-hour window as of the 20th?
>
> A: No.  That's an artificial time constraint.
>
> Q: Just pure speculation, correct?
>
> A: Yes.

(Docket Entry No. 114, Ex. B., Dr. Weinstein Depo., 171).  Dr. Weinstein also admitted several times during his deposition that he could not testify as to whether Dr. Foster's failure to arrange for Yates-Williams to see a specialist from August 20 until August 24 caused Yates-Williams's injuries. He testified as follows:

> Q: Had she gotten this patient to a proper neurosurgeon before irreversible damages occurred, then you would agree with me that she would not be the cause of the irreversible damage?
>
> A: Right.
>
> Q: And as we sit here today, you can't tell me when that irreversible damage occurred?
>
> A: I could tell you that on the 20th there was no sign of irreversible damage, but I cannot give you the date that the irreversible damage ensued.
>
> Q: And if the irreversible damage ensued after the 25th, then Dr. Foster got this patient to appropriate medical intervention before the irreversible damage, correct?
>
> . . . .
>
> A: You bet.

Q: Your opinion, according to this paragraph, was that Dr. Foster needed to get appropriate medical intervention for the patient before irreversible damage occurred, correct?

A: Uh-huh.

Q: And for the same reason, I'll ask you to explain to us, you cite in this paragraph the date was August 21.  You're telling us —

A: I was giving you a rough opinion — I used the date August 21 because she was seen on the 20th; and so, you know, within the proximate 24 hours, I use that date.

Q: I guess I need to know what's magic about 24 versus 48.

A: Because there's no described obvious neurologic deficit and because in Harrison's it says, "Treatment is emergency decompressive laminectomy debridement combined with long-term antibiotic treatment.  Surgical evacuation prevents development of paralysis and may improve or reverse paralysis in evolution, but is unlikely to improve more than several days duration."

. . . .

Q: Harrison's is not a surgical text, correct?

A: It's a medical text.

Q: And it's to tell medical physicians and doctors of osteopathy to — and that excerpt from Harrison's says that if you suspect an epidural spinal abscess, get them a neurosurgeon, right?

A: Correct.

Q: And you get them to a neurosurgeon.  According to your opinion, if they're gotten to a neurosurgeon before irreversible damage occurs, then the doctor has acted appropriately, correct?

A: Yes.

Q: In this case, you cannot say this patient was not gotten to a neurosurgeon before the irreversible damage occurred, correct?

A: I can't say that she was there before any damage occurred.

18

(*Id.*, 153–56).  Later in the deposition, Dr. Weinstein testified similarly:

> Q: And you don't know when the irreversible damages set in this
> case, correct?
>
> A: Correct.
>
> Q: So you can't say that what she did brought about the irreversible
> damages, correct?
>
> A: Right.

(*Id.*, 160).  Dr. Weinstein's deposition testimony shows that he cannot reliably testify that the delays

from August 20 to August 24 in Yates-Williams's treatment proximately caused Yates-Williams's

injuries.

The plaintiffs cannot show that Dr. Weinstein's professional experience provides a reliable

basis for his testimony that Dr. Foster's negligence proximately caused Yates-Williams's injuries.

Dr. Weinstein's resume shows no experience or specific education in neurosurgery, orthopedics, or

infectious diseases.  His resume shows that he has practiced and taught internal medicine since 2005.

(Docket Entry No. 115-6, Dr. Weinstein Resume).   Dr. Weinstein acknowledged during his

deposition that he has only been involved in "less than five" cases of "patients who had spinal

surgery on the lumbar spine and developed a postoperative infection."  (Docket Entry No. 114-2,

Dr. Weinstein Depo., 49–50).  Dr. Weinstein also admitted that he was qualified only to comment

on the "general medical part" of the case, not "the neurosurgical part."  (*Id.*, 28).  He also admitted

that he would defer to a neurosurgeon's opinion about "the originating site of the infection," whether

the cauda equina is part of the spinal cord, and when Yates-Williams's infection became a

"neurosurgical emergency."  (*Id.*, 51, 54, 185). Dr. Weinstein did testify that his experience as a

general practioner "incorporates some aspects of neurology and neurosurgery and infectious

19

disease," but he "[is] not a neurosurgeon, nor would [he] give a neurosurgical opinion." (*Id.*).  Dr.

Weinstein's professional experience does not provide a reliable basis to support these causation

opinions.        The motion to strike is granted as to Dr. Weinstein's opinions and testimony that:

- delays in Yates-Williams's treatment caused the effects of her spinal infection to become irreversible;

- Dr. Foster's failure to communicate with Dr. El Nihum after Yates-Williams's August 6, 2007 visit with Dr. Foster caused the effects of her spinal infection to become irreversible; and

- Dr. Foster's Bactrim prescription caused the effects of Yates-Williams's spinal infection to become irreversible.

The motion to strike is denied as to Dr. Weinstein's opinions and testimony that:

- Dr. Foster had a duty to secure Yates-Williams's admission to a hospital on August 20, 2009 and that securing her admission to a hospital would have provided effective treatment.  (Docket Entry No. 115-7, Dr. Weinstein Expert Report, 6–7).

- Dr. Foster had a duty to communicate to Dr. Friedman the laboratory test and results, which were consistent with the presence of infection, and that had this been done, Dr. Friedman would have treated Yates-Williams more effectively.  (*Id.*, 7).[1].

**B.       Dr. Francis**

Dr. Francis stated in his expert report that Dr. Foster's failure to inform either Dr. El Nihum

on August 20 of Yates-Williams's infection or to make certain on August 20, 2008 that a

neurosurgeon or spinal surgeon evaluated her caused her infection to progress, resulting in "cauda

equina syndrome, vertebral body erosion, and permanent neurologic impairment."  (Docket Entry

No. 115-10, Dr. Francis Expert Report).

---

[1]  To the extent Dr. Foster and READ argue that Dr. Weinstein is not qualified to testify as to the standard of care applicable to Dr. Foster, that argument is without merit.  Dr. Weinstein is qualified as an expert under Rule 702 to testify to the general standards of care applicable to general practioners.  His experience and education as a general practioner qualifies him to offer testimony as to the applicable standards of care for general practioners such as Dr. Foster.  *Huss*, 571 F.3d at 452.

Dr. Francis testified in his deposition, however, that Dr. Foster did not breach the standard of care in failing to call Dr. El Nihum on August 20 because Dr Foster knew that Yates-Williams did not want to return to Dr. El Nihum.  This is consistent with Yates-Williams's testimony.  She testified that by August 20, 2008, she no longer wished to see Dr. El Nihum.  (Docket Entry No. 123, Ex. B, Dr. Weinstein Depo., 129).  Dr. Francis testified as follows:

> Q: Going back for a minute on the opinions you hold with Dr. Foster. As I understand it now, you're not saying that she had a duty to call Dr. El Nihum on the 20th because the patient made it clear on that day that she wasn't going back, right?
>
> A: Correct.  I mean, that was the treating doctor.  That would be the normal course of events, you call Dr. El Nihum, but the patient said that she didn't want to go back to him.
>
> Q: So it was okay for Dr. Foster to make arrangements for a different surgeon instead?
>
> A: Yes.

(Docket Entry No. 113, Ex. B, Dr. Francis Depo., 201–02).

Dr. Francis also admitted that even if Dr. Friedman saw Yates-Williams before August 25, his treatment of Yates-Williams would not have changed and Yates-Williams's injuries still would have occurred.  He testified as follows:

> Q: . . . .  You've already told us that had Dr. Friedman seen the patient even on the 20th or 21st you have no reason to believe he would have done anything differently, correct?
>
> A: Well, based on what he did the 25th, I don't think he would have.
>
> Q: Right.  So even if Dr. Foster had fulfilled her duty, as you define the duty, and gotten the patient to Dr. Friedman on either the 20th or 21st surgery wouldn't have taken place for at least another three days, correct?
>
> . . . .

21

A: I guess that's right.

Q: That's right.  You are completely speculating what may have taken place if the duty had been fulfilled, correct?

A: Oh, absolutely.

(*Id.*, 332–33).  He also testified as follows:

Q: Doctor, with regard to the time frame from the 20th to the 25th, you don't have any evidence that had the patient been seen by Dr. Friedman on the 24th, 23rd, 22nd, 21st he would have done anything different than what he ordered and did on the 25th, do you?

A: Possibly he could have.  It depends.  It really would depend on what he said or what — I mean what he asked her and what she said and what he found in that interval time.

Q: And . . . but that goes for the 25th as well.  I mean his decisions — treatment decisions — the things that he ordered on that date to evaluate his patient were based on the history and exam that is performed on the 25th, correct?

A: Yes.

Q: And what I'm asking you is you have no evidence that he would have done anything differently had he seen her any earlier?

A: Oh, no, I think he would ordered the same tests and so on and so forth.  I — yeah — I didn't understand you.

(*Id.*, 202–03).

Dr. Francis also opined that the effects of Yates-Williams's spinal infection became irreversible between August 20, 2008 and August 25, 2008, and that delays in her treatment caused her injuries to become irreversible.  Dr. Francis testified that Yates-Williams had, to a reasonable medical probability, irreversible damage by August 25.  He based this opinion in part on Yates-Williams's testimony that on that date, she had improper nerve function (radiculopathy) and

incontinence of urine; was stumbling and falling; had a fever; and had increased pain and weakness. (Docket Entry No. 113, Ex. B, Dr. Francis Depo., 288–89).  He also testified that effective treatment between August 20, 2008 and August 25, 2008 would have, to a reasonable medical probability, prevented irreversible nerve damage.  (*Id.*, 289–90).

Dr. Francis is qualified to offer these opinions.  His resume shows that he is a board certified orthopedic surgeon specializing spinal surgery, has served as a Clinical Assistant Professor at the Baylor College of Medicine and the University of Texas Medical Branch, and was the director of the Spine Fellowship Programs in the orthopedic surgery divisions of both Baylor College of Medicine and the University of Texas Medical Branch.  (Docket Entry No. 115-9, Dr. Francis Curriculum Vitae).  READ and Dr. Foster point out that Dr. Francis is not an infectious disease specialist, and that he has not performed spinal surgeries since 2007.  This goes to the weight of his testimony, but not to its admissibility.  *Huss*, 571 F.3d at 452 ("Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.").  And the combination of Dr. Francis's qualifications and his experience performing spinal surgeries and treating and diagnosing postoperative infections provides a reliable basis for his conclusions.  During his deposition, Dr. Francis testified that he performed spinal surgeries from 1978 to 2007, (Docket Entry No. 113, Ex. B., Dr. Foster Depo., 281).  Dr. Francis also testified that he has experience treating patients who developed infections after surgery.  (*Id.*, 276).  The Fifth Circuit has held that such experience is a reliable basis for expert testimony.  *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246 (5th Cir. 2002) (noting that "first-hand observations and professional experience in translating these observations into medical diagnoses" can provide a reliable basis for expert

23

testimony); *see also Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996) (holding that an internist was sufficiently qualified to give expert testimony on his diagnosis of mesothelioma even though he was not pathologist, oncologist or expert in definitive cancer diagnosis); *McHugh v. Jackson*, Civ. No. 07-2970 (JBS), 2010 WL 744125, at *3 (D.N.J. Mar. 2, 2010) (finding that a practicing internist is qualified to render an opinion on the effects of dialysis even though the doctor did not have recent training or experience in nephrology or post-dialysis care).

Dr. Foster and READ emphasize that Dr. Francis did not conduct any research before offering his opinion and has not practiced spinal surgery since 2007.  But Dr. Foster and READ do not provide any basis to conclude that Dr. Francis's testimony is inconsistent with relevant medical literature, or that the diagnosis and treatment of postoperative MRSE infections has changed since 2007 so as to make Dr. Francis's testimony unreliable.

Dr. Foster and READ argue that Dr. Francis's testimony is unreliable because he admitted during his deposition that the plaintiffs' attorneys provided him an incomplete factual record and highlighted parts of the record.  Dr. Foster and READ emphasize that Dr. Friedman admitted that the factual record on which he based his conclusions did not contain all the medical records from Yates-Williams's visit to Dr. Friedman on August 25, 2008.  (Docket Entry No. 113, Ex. B, Dr. Francis Depo., 54–55).  Dr. Foster and READ also point out that Dr. Francis's testimony appeared to change after he learned more details from the medical records of Yates-Williams's August 25, 2008 visit to Dr. Friedman.  The attorney cross-examining attorney informed Dr. Francis that, contrary to the facts provided him by the plaintiffs' attorneys, Dr. Friedman's physician assistant—not Dr. Friedman—concluded that Yates-Williams had radiculopathy. (*Id.*, 236–41).  The attorney also informed Dr. Francis that, contrary to the facts provided him by the plaintiffs' attorney,

Dr. Friedman did not diagnose Yates-Williams with a lumbar infection.  (*Id.*).  The attorney also

pointed out conflicting information as to the extent of Yates-Williams's incontinence on August 25.

(*Id.*).   During his deposition, Dr. Francis appeared to equivocate as to whether having complete

medical records from Yates-Williams's visit to Dr. Friedman would change his opinion.  At the end

of his deposition, Dr. Francis testified as follows:

> Q: So you can't say in reasonable medical probability whether or not
> she was already in irreversible condition as of the 25th?
>
> A: No.  I'm basing that on what she said was wrong —
>
> Q: Okay.  So —
>
> A: — not on what Dr. Friedman reported in his findings.
>
> Q: Right.  As we sit here today, you can't say based on reasonable
> medical probability whether her condition was irreversible as of the
> 25th?
>
> A: No, because I have conflicting reports.

(*Id.*, 334).  But just before this testimony, Dr. Francis testified that he could, to a reasonable medical

probability, conclude that Dr. Foster's failure to secure appropriate, timely care for Yates-Williams

caused irreversible damage.  Dr. Francis testified as follows:

> A: I think that at the point in time she realized that Ms. Yates had a
> serious problem and that she needed the assistance of someone in a
> decision capacity that could treat Ms. Yates outside her own
> capabilities that when she tried to arrange for an opinion to have Ms.
> Yates seen and treated right away, that while she made an effort to set
> this up, there was no follow up either with Ms. Yates or with the
> doctor's office and she had no idea that Ms. Yates was not sen and
> treated. And I think it's her responsibility to make sure that this was
> carried out so that the transfer of care could be done appropriately.
>
> Q: Do you have an opinion as to whether or not Dr. Lacrecia Foster
> had an obligation to ensure that transfer of appropriate care to Margo
> Yates occurred on or about August 20th, 2008?

. . . .

A: I think that she should have ensured Ms. Yates' care was properly transferred and acknowledged.

Q: Why did Lacrecia Foster have a medical duty of care to ensure that Margo Yates was appropriately transferred on or about August 20, 2008 . . . .

A: Ms. Yates had presented with fever and increasing back pain shortly after a surgical procedure.  She had seen her treating physician who had referred the patient to Ms. Foster.  Ms. Foster had — I mean Dr. Foster had ordered appropriate testing and an MRI which revealed a suspicious collection of fluid.  The radiologist had contacted Dr. Foster and in his opinion felt that this patient should be seen by her treating physician as soon as possible.  This was out of the realms of expertise of Dr. Foster . . . .

Q: Why was appropriate transfer of care necessary and required to occur on the 20th of August 2008 in your opinion?

. . . .

A: Because this patient had what turned out to be an epidural abascess that needed surgical treatment and that was not in the expertise of Dr. Foster.

Q: Based on your training, experience, applicable medical literature is there a window of opportunity for the treatment of an epidural abscess that if the window of opportunity is missed can result in permanent and irreversible neurological loss?

A: Yes

. . . .

Q: Do you have an opinion, sir, whether or not based upon the information you have been able to review relevant to [the] examination both by the PA and by Dr. Friedman whether or not Margo Yates was displaying indications of neurological impairment at the time of that examination.

A: I think she was.

26

. . . .

Q: Do you have an opinion whether or not the symptomatology described by Margo Yates, including urinary incontinence, stumbling, falling, radicular pain, pain in her back, fever, weakness — whether those are symptoms which existed and which were being experienced by Margo Yates between July 7th and July — excuse me — August 7th and August 25th.

. . . .

A: . . . I think that she had the signs and symptoms of an acute epidural abscess and that she was deteriorating both in the spinal stability as well as neurologic function.

Q: Do you have an opinion, sir, whether or not if Dr. Lacrecia Foster had either contacted Dr. Jonathan Friedman and required that he see Margo Yates on August 20, 2008, and/or whether she had contacted the emergency department of the Med and sough hospitalization through that department or through a hospital list for the Med — do you have an opinion sir, if treatments of the epidural infection had occurred on or about the 20th or the 21st of August 2008, whether that medical treatment could have in all reasonable medical probability avoided permanent and irreversible neurological damage secondary to the presence of that infection?

. . . .

A: I think in all likelihood it would have prevented irreversible neurologic damages.

Q: If I were to say, to use a lay phrase, that as of August 20th 2008 the clock was ticking on Margo Yates' neurologic situations such that her window of opportunity to avoid permanent and irreversible neurological loss was being eliminated by a delay in medical treatment would that be a fair assessment of her situation?

. . . .

A: I think that the delay in rendering definitive medical care was one of the prime reasons that she has continuing neurologic damage.

27

(*Id.*, 284–90).

Taken together and in context, the opinion is admissible. *See Pipitone*, 288 F.3d at 249–50 (holding that jury was entitled to hear expert testimony and decide whether to accept or reject it after considering whether predicate facts on which expert relied were accurate); *Jackson v. City of Pitt., Pa.*, Civ. A. No. 07-111, 2010 WL 3222137, at *14 (W.D. Pa. Aug. 13, 2010) ("An expert is . . . permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury." (quoting *Walker v. Gordon*, 46 F. App'x. 691, 695–96 (3d Cir. 2002)); *Yates-Williams v. Nihum*, 268 F.R.D. 566, 571 (S.D. Tex. 2010) (noting that the Committee Note for Rule 702 of the Federal Rules of Evidence states "[t]he emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other"). Assuming that Yates-Williams accurately testified as to her symptoms on August 25, 2008, and assuming that Dr. Friedman reached incorrect conclusions about her symptoms, Dr. Francis is able to testify that, to a reasonable medical probability, Yates-Williams's injuries became irreversible between August 20, 2008 and August 25, 2008 and that Dr. Foster's failure to ensure she received medical care during that time period — either by consulting another doctor or admitting her to CSMC's emergency room — caused her injuries.[2]

The motion to exclude is granted as to Dr. Francis's opinions that:

- Dr. Foster's failure to inform Dr. El Nihum on August 20, 2008 caused the effects of Yates-Williams's spinal infection to become irreversible; and

---

[2] Dr. Foster and READ also point out that Dr. Francis could not identify the specific day on which Yates-Williams's injuries became irreversible. This does not make his opinion or testimony unreliable because he reliably identified a range of days during which Yates-Williams's injuries became irreversible.

28

- Dr. Dr. Foster's failure to ensure that Dr. Friedman saw Yates-Williams before August 25, 2008 caused the effects of Yates-Williams's spinal infection to become irreversible.

The motion to exclude is denied as to Dr. Francis's testimony that:

- Yates-Williams's injuries became irreversible between August 20, 2008 and August 25, 2008, and

- delays in Yates-Williams's treatment caused the effects of Yates-Williams's spinal infection to become irreversible.

### C.    Evidence of Causation

The evidence, including the admissible opinions of Dr. Weinstein and Dr. Francis, create fact

issues about whether:

- effects of Yates-Williams's spinal infection became irreversible between August 20, 2008 and August 25, 2008;

- Dr. Foster's failure to admit Yates-Williams to a hospital on August 20, 2008 breached her standard of care and caused the effects of Yates-Williams's spinal infection to become irreversible; and

- Dr. Foster's failure to communicate with Dr. Friedman about her treatment of Yates-Williams breached her standard of care and caused effects of Yates-Williams's spinal infection to become irreversible.

The motion for summary judgment is denied.

### IV.    Conclusion

Dr. Foster and READ's motion to exclude the opinions of Dr. Adam Weinstein and Dr. William Francis, is granted in part and denied in part.  (Docket Entry No. 92).  The motion to exclude is granted as to Dr. Weinstein's opinions and testimony that:

- delays in Yates-Williams's treatment caused the effects of her spinal infection to become irreversible;

29

- Dr. Foster's failure to communicate with Dr. El Nihum after Yates-Williams's August 6, 2007 visit with Dr. Foster caused the effects of her spinal infection to become irreversible; and

- Dr. Foster's Bactrim prescription caused the effects of Yates-Williams's spinal infection to become irreversible.

The motion to strike is denied as to Dr. Weinstein's opinions and testimony that:

- Dr. Foster had a duty to secure Yates-Williams's admission to a hospital on August 20, 2009 and that securing her admission to a hospital would have provided effective treatment.

- Dr. Foster had a duty to communicate to Dr. Friedman the laboratory test and results, which were consistent with the presence of infection, and that had this been done, Dr. Friedman would have treated Yates-Williams more effectively.

The motion to exclude is granted as to Dr. Francis's opinions that:

- Dr. Foster's failure to inform Dr. El Nihum on August 20, 2008 caused the effects of Yates-Williams's spinal infection to become irreversible; and

- Dr. Dr. Foster's failure to ensure that Dr. Friedman saw Yates-Williams before August 25, 2008 caused the effects of Yates-Williams's spinal infection to become irreversible.

The motion to exclude is denied as to Dr. Francis's testimony that:

- Yates-Williams's injuries became irreversible between August 20, 2008 and August 25, 2008; and

- delays in Yates-Williams's treatment caused the effects of Yates-Williams's spinal infection to become irreversible.

Foster and READ's motion for summary judgment, (Docket Entry No. 123), is denied.

SIGNED on March 24, 2011, at Houston, Texas.

Lee H. Rosenthal

Lee H. Rosenthal
United States District Judge